LATHAM & WATKINS LLP
Kelly E. Richardson (CA Bar No. 210511)
kelly.richardson@lw.com
John T. Ryan (CA Bar No. 211899)
jake.ryan@lw.com
Shawn T. Cobb (CA Bar No. 259654)
shawn.cobb@lw.com
Benjamin D. Gibson (CA Bar No. 287521)
benjamin.gibson@lw.com
12670 High Bluff Drive
San Diego, California 92130
Telephone: (858) 523-5400
Fax: (858) 523-5450

Margaret A. Tough (CA Bar No. 218056)
margaret.tough@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Fax: (415) 395-8095

Attorneys for Defendant
Montrose Chemical Corporation of California

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | CASE NO. 2:90-cv-03122-DOC(GJSx) |
| Plaintiffs, | **MONTROSE CHEMICAL CORPORATION OF CALIFORNIA'S OPPOSITION TO PLAINTIFF UNITED STATES OF AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| MONTROSE CHEMICAL CORPORATION OF CALIFORNIA, et al., | *(Filed Concurrently with Statement of Genuine Disputes of Material Fact and Additional Material Facts, Evidentiary Objections, Declaration of Mark Johns, and Declaration of Benjamin Gibson)* |
| Defendants. | Trial Date: December 10, 2020 Judge: Hon. David O. Carter |
| | Hearing Date:            October 26, 2020 Time:            8:30 a.m. Location:            Courtroom 9 D |

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. LEGAL STANDARD FOR SUMMARY JUDGMENT ..............................2

III. DISCUSSION.......................................................................................2

   A.   The Government Is Not Entitled to Summary Judgment on Liability ....................................................................................2

      1.   Legal Standard for Causation......................................3

      2.   The Government Admits that Montrose is Not Responsible for DDT Concentrations Below Background ...................................................................4

      3.   The Court Has Already Rejected the Government's "Aerial" Dispersion Theory ......................................6

      4.   The Stormwater Deposition Theory Is Disputed ....................10

   B.   The Government Is Not Entitled to an Award of Costs....................15

      1.   The Government Is Not Entitled to Summary Judgment on Operable Unit 6 Past Response Costs ...............15

      2.   The Government Has Not Established that the Response Costs Are Germane to the Location at Issue.....................................................................................16

      3.   There Are Disputed Issues of Fact As to Whether the Response Costs Incurred by the EPA Are Inconsistent with the NCP and Non-Recoverable ..................17

      4.   The Government's Request for a Ruling that its Costs are Presumed Consistent with the NCP Is Improper....................................................................................20

      5.   The Government Is Not Entitled to a Declaratory Judgment for Future Response Costs......................................23

   C.   The Release Provided in the Current Stormwater Pathway Consent Decree Precludes Summary Judgment..................24

IV. CONCLUSION........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...................................................................................2, 23

*Asarco LLC v. Cemex, Inc.,*
21 F.Supp.3d 784 (W.D. Tex. 2014) ........................................................3, 10

*British Airways Board v. Boeing Co.,*
585 F.2d 946 (9th Cir. 1978) ............................................................................2

*Castaic Lake Water Agency v. Whittaker Corporation,*
272 F.Supp.2d 1053 (C.D. Cal. 2003) ..............................................................3

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..........................................................................................2

*Center for Biological Diversity v. U.S. Forest Service,*
925 F.3d 1041 (9th Cir. 2019) ........................................................................21

*Fireman's Fund Ins. Co. v. City of Lodi,*
302 F.3d 928 (9th Cir. 2002) ..........................................................................21

*Fresno Motors, LLC v. Mercedes Benz USA, LLC,*
771 F.3d 1119 (9th Cir. 2014) ........................................................................23

*Hensley v. Eckerhart,*
461 U.S. 424 (1983)...................................................................................21, 22

*In re Bell Petroleum Services, Inc.,*
3 F.3d 889 (5th Cir. 1993) ..............................................................................23

*Kalamazoo River Study Group v. Rockwell Int'l Corp.,*
171 F.3d 1065 (6th Cir. 1999) ....................................................................3, 10

*Minnesota v. Kalman W. Abrams Metals, Inc.,*
155 F.3d 1019 (8th Cir. 1998) ........................................................................17

*Thomas v. FAG Bearings Corp.,*
846 F.Supp. 1382 (W.D. Mo. 1994) .................................................................4

*United States v. Alcan Aluminum Corp.,*
964 F.2d 252 (3d Cir. 1992) .............................................................................4

*United States v. Alcan Aluminum Corp.,*
990 F.2d 711 (2d Cir. 1993) .............................................................................4

*United States v. Chapman,*
146 F.3d 1166 (9th Cir. 1998) ...........................................................20, 21, 22

# TABLE OF AUTHORITIES (CON'T)

**Page(s)**

*United States v. E.I. Dupont De Nemours & Co.,*
   432 F.3d 161 (3d Cir. 2005) ............................................................... 17

*United States v. Kramer,*
   913 F. Supp. 848 (D.N.J. 1995) ......................................................... 18

*Washington State Dept. of Transp. v. Washington Natural Gas. Co.,*
   *Pacificorp,*
   59 F.3d 793 (9th Cir. 1995) .............................................................. 17

## STATE CASES

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,*
   5 Cal. 4th 854 (1993) ...................................................................... 24

## FEDERAL STATUTES

40 C.F.R. § 300.430 ........................................................................... 18

## FEDERAL RULES

42 U.S.C. § 9613 ................................................................................ 23

Fed. R. Civ. P. 56 ......................................................................... 2, 17, 23

## OTHER REFERENCES

Black's Law Dictionary (6th ed. 1990) ............................................... 24

## I.     INTRODUCTION

More than twenty years ago, the United States first alleged that Montrose Chemical Corporation of California ("Montrose") was responsible for DDT carried in stormwater runoff through the Historic Stormwater Pathway, a former drainage area stretching more than eight miles from the Montrose property near Torrance, California to Los Angeles Harbor.  In the time since, both Montrose and the government conducted investigations at a cost of millions of dollars.  After all this time and effort, the government[1] now asks the Court for partial summary judgment on the liability of defendants Montrose and Bayer CropScience, Inc. for one 500-foot stretch of the pathway straddling the ECI Property and seven adjacent residential properties (the "South of Torrance Properties"), and a narrow technical ruling that its costs were adequately documented.

Tellingly, the government's argument for defendants' liability for the Historic Stormwater Pathway does not open with a stormwater deposition theory, but rather speculation that DDT dust traveled in the wind—speculation that the government and its contractor previously found to be unsupported by the evidence. The evidence that was generated during the course of those field investigations and that defendants developed during discovery has eviscerated the government's case because that evidence indicates that DDT contamination at the South of Torrance Properties arrived in "fill" unrelated to defendants that was imported from outside the site and not via stormwater.  The government's eleventh-hour resurrection of the long-discredited aerial dispersion theory reflects the government's increasingly tenuous position.

In support of summary judgment, the government distorts and misrepresents evidence as well as the applicable law.  Testimony that something "could" have

---

[1] Plaintiff California Department of Toxic Substances Control ("DTSC") did not move for summary judgment or file a joinder.  All DTSC claims for liability and costs will need to proceed to trial.

1   occurred is twisted to become admissions that something "did" happen.  The

2   government's unspoken legal standard appears to be that defendants must disprove

3   the government's case with absolute certainty.  The law, however, is that the

4   government carries the burden of proof.  Independently, the motion should be

5   denied because the material facts upon which the government relies are disputed.

6   **II.    LEGAL STANDARD FOR SUMMARY JUDGMENT**

7          When moving for summary judgment, the moving party must show "that

8   there is no genuine dispute as to any material fact and the movant is entitled to

9   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of "establishing

10  that there is no genuine issue of material fact lies with the moving party." *British*

11  *Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978).   The party

12  opposing summary judgment may rebut the moving party's case by "produc[ing]

13  evidentiary materials that demonstrate the existence of a 'genuine issue' for

14  trial[.]"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  "The evidence of the

15  non-movant is to be believed, and all justifiable inferences are to be drawn in his

16  favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

17  **III.   DISCUSSION**

18         **A.    <u>The Government Is Not Entitled to Summary Judgment on</u>**

19                 **<u>Liability</u>**

20         The government's Motion for Partial Summary Judgment (the "Motion") is

21  predicated on a simple proposition:  that there is no genuine dispute of material

22  fact regarding Montrose's liability for DDT contamination in the South of

23  Torrance Properties.[2]  According to the government, there is only a single element

24  of liability remaining to be decided:  "whether releases of DDT from the Montrose

25  DDT Plant and Stauffer Property caused the United States to incur response costs

26

27  ───────────────

    [2] Motion at 14.

28

1    at the South of Torrance Properties."[3]  The government argues it meets this

2    causation burden on summary judgment because "uncontroverted evidence…

3    shows that wind and surface water carried DDT to the South of Torrance

4    Properties."[4]  The government is mistaken on both counts.

5              *1.    Legal Standard for Causation*

6              As a threshold matter, the government's Motion omits any meaningful

7    discussion of the legal standard for causation in "two-site" CERCLA cases.[5]  The

8    appropriate causation standard in a two-site case such as this requires the plaintiff

9    to "establish a causal connection between the defendant's release of hazardous

10   substances and the plaintiff's response costs incurred in cleaning them up."

11   *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th

12   Cir. 1999) (hereafter "*Kalamazoo*").  It is not sufficient for the plaintiff to show a

13   mere possibility that contamination at the second site arose from first site; rather,

14   the plaintiff must "show that [the defendant] *did* contribute" to the contamination

15   at the second site.  *Id.* at 1072 (emphasis added).[6]  This standard is necessary to

16   prevent potentially unlimited geographic liability over unrelated contamination.

17   *E.g.*, *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1387 (W.D. Mo. 1994)

18   ("[T]here is no indication that Congress intended this absurd result.").

19   _____

20   [3] *Id.* at 6.

     [4] *Id.* at 14.

21   [5] A "two-site" CERCLA case arises where, like here, a release from one site
22   migrates to a different site.  *E.g.*, *Asarco LLC v. Cemex, Inc.*, 21 F.Supp.3d 784,
     803 (W.D. Tex. 2014).

23   [6] In a status report, the government proffered a different causation standard set
     forth in *Castaic Lake Water Agency v. Whittaker Corporation*, 272 F.Supp.2d 1053
24   (C.D. Cal. 2003).  ECF 2962 at 10.  After observing that "the issue of causation in
     two-site cases is a difficult one," the *Castaic Lake* court held—on the facts of that
25   case only—that the plaintiff must show that the same or chemically similar
     hazardous substance exists at each site, and that there is a "plausible" migration
26   pathway by which the hazardous substance could have travelled between the sites.
     *Castaic Lake* at 1066.  The Ninth Circuit has never adopted this analysis, and,
27   under either analysis, there are disputed facts which preclude the government's
     request for summary judgment here.  *See infra* at III.A.3 and 4.

28

2. ***The Government Admits that Montrose is Not Responsible for DDT Concentrations Below Background***

In an effort to diminish its legal burden of proof, the government argues it should be allowed to prove causation by showing that *any* DDT at the South of Torrance Properties—no matter how small the quantity—originated from the Montrose plant.[7]  The fundamental problem with this proposition is that the U.S. Environmental Protection Agency's ("EPA") own investigations and admissions by its witnesses demonstrate that it does not apply to the facts of this case.

DDT was widely used throughout Southern California, and in particular in the Los Angeles County area, between 1944 and 1969.[8]  The government's own witnesses conceded in deposition that "DDT was commonly used everywhere . . . in pest control, agriculture, household use."[9]  The historical record also indicates that the government itself intentionally applied DDT for pest control purposes in the Torrance Lateral area—*i.e.*, the exact same geographic area that the government now contends was contaminated by Montrose.[10]

In its effort to "pin DDT in soils . . . on Montrose," EPA set out to determine the regional "background" level of DDT in the geographic area around the Montrose plant.[11]  Despite sampling areas that were upwind and as far as four miles distant from the Montrose property, and intentionally omitting areas with probable DDT treatment for pest control purposes (such as the stormwater pathway

---

[7] Motion at 2.  Multiple circuits have recognized circumstances in which a defendant can avoid liability for response costs if its contributions are below background concentrations.  *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 717 (2d Cir. 1993); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 267-71 (3d Cir. 1992).

[8] HSP 207, Expert Report of M. Reis at 4-9 (Mar. 13, 2020) ("Reis Report").

[9] HSP 469, Rodriguez Tr. at 100:2-4.

[10] HSP 207, Reis Report at 9-14.

[11] HSP 460, Email from J. Dhont (EPA) to N. Black (EPA) re: Trustee response to latest Montrose ERA WP, at 1 (Aug. 31, 1998) (2000 Trial Ex. 5441).

1  itself), 91 percent of the background samples EPA collected still had detectable

2  levels of DDT.[12]  EPA ultimately concluded that the residential background level

3  of DDT in the south Los Angeles area—in other words, the level that can be

4  attributed to the generalized use of DDT in the area—is 10 parts per million

5  ("ppm").[13, 14]

6       Over the past two decades, EPA has repeatedly admitted that DDT

7  concentrations below background **cannot be attributed to Montrose**.  As Jeffrey

8  Dhont, an EPA Rule 30(b)(6) witness, explained:  "[B]ecause DDT was so widely

9  used and is so persistent, at very low levels it becomes very difficult to determine

10  where DDT from Montrose ends - vs. DDT from all other sources, the 'noise.'"[15]

11  Another EPA Rule 30(b)(6) designee, Susan Keydel, agreed, repeatedly stating

12  EPA's view that Montrose is responsible for DDT concentrations **above**

13  **background**.[16]  For more than 20 years, the government has acknowledged that

14  low levels of DDT are insufficient to establish any plausible connection between

15
16  [12] HSP 227, Draft Quality Assurance Project Plan, Soil Investigation for Historic Stormwater Pathway - South, CH2M Hill, at 2-7 (Mar. 2006); HSP 470, Dhont Tr. at 83:6-84:17 (Feb. 24, 2020).

17
18
19
20
21  [13] HSP 95, Action Memorandum, Request for Removal Action for Kenwood Storm Water Drainage Pathway, at 8 (June 8, 2001); HSP 471, Keydel 30(b)(6) Tr. at 23:25-24:9 (Q: "Does EPA still believe that 10 parts per million DDT is the background level in this area? A: "It is the upper range of background for the area, yes.").  Montrose disputes that this is the correct "background" level of DDT in the area, as evidenced by other government background studies concluding that the correct figure is 22 ppm.  HSP 350, Corrected Expert Report of Government Expert A. Medine, at 80.

[14] It is important to emphasize that this figure—10 ppm—is far lower than anything that would ever present a risk to human beings.  According to EPA, **a person could literally eat soil with DDT contamination seventeen times higher every single day for 30 years and not have any significant health concerns.** HSP 461, EPA Fact Sheet, Montrose Superfund Site, at 2 (July 2002).

22
23
24
25  [15] HSP 460, Email from J. Dhont (EPA) to N. Black (EPA) re: Trustee response to latest Montrose ERA WP, at 1 (Aug. 31, 1998) (2000 Trial Ex. 5441).

[16] *See* HSP 471, Keydel 30(b)(6) Tr. at 80:24-81:1 ("EPA believes that Montrose is responsible for DDT above background at the ECI property."); *id.* at 82:25-83:10 ("EPA believes that Montrose is responsible for DDT above background at the ECI property because of where it came to be located following soil disturbances in the construction of the stormwater pathway.").

26
27
28

1    historical Montrose operations and the contamination at issue.  The government

2    cannot now act like it never made those admissions or that the historical record

3    does not exist.  Thus, according to the government's own witnesses, DDT at 10

4    ppm is effectively a zero reading for purposes of this case, and Montrose cannot be

5    held liable for anything below 10 ppm.[17]

6              *3.       The Court Has Already Rejected the Government's "Aerial"*

7                        *Dispersion Theory*

8              The government's first argument for how Montrose operations allegedly

9    caused DDT to be present in this particular area of the "Historic *Stormwater*

10   *Pathway*" is that the DDT was "aerially" dispersed by the wind.[18]  Contrary to the

11   government's claims, Montrose never admitted that DDT arrived at the South of

12   Torrance Properties via aerial dispersion.  And EPA has conceded multiple

13   times—and this Court has already concluded in an earlier summary judgment

14   order—that the evidence does not support this theory.

15             EPA first started investigating aerial dispersion of DDT from the Montrose

16   plant in 1986 and that investigation continued into the early 2010s.[19]  According to

17   EPA, if aerial dispersion had actually occurred, "DDT concentrations… (a) would

18   be greatest to the southeast of the plant property [i.e., in the prevailing wind

19   direction]; (b) would show a gradient of decreasing concentration with increasing

20   distance from the plant property; and (c) would be greater than the concentrations

21

22

23   _____

     [17] The government's investigation did not find DDT contamination above

24   background at multiple residential properties.  HSP 22, Draft Field Investigation
     Report at 3-8 to 3-10 (Sept. 2008).

25   [18] Motion at 2, 8, 17.

26   [19] HSP 472, Amended CERCLA Site Sampling Plan and Sampling Documentation
     Report, Off-Site Sample for Air Dispersion of DDT, Ecology and Environment,

27   Inc. (Oct. 17, 1986); HSP 359, Remedial Investigation Report Addendum (Apr.
     2001); HSP 357, Revised Supplemental Soil Investigation Report (Apr. 24, 2012).

28

found in 'background' areas away from the Montrose Plant."[20]  No such pattern was found.[21]  In a 1999 draft fact sheet intended to educate the public, EPA admitted that "[t]he sampling data show that little, if any, DDT contamination resulted from dust blown from the plant."[22]  Likewise, EPA's contractor concluded in its Draft Completion Report for the Neighborhood Investigation that "it can not [sic] definitively [be] stated that the elevated levels of DDT were the result of aerial dispersion."[23]  Yet the government persisted in arguing that Montrose was liable for DDT contamination in the "Neighborhood" as a result of aerial dispersion.[24]

EPA's aerial dispersion model predicted that the highest concentrations of aerially dispersed DDT would be found at 204th Street.[25]  In its final Completion Report, EPA removed any reference to its contractor's earlier admissions that there was little to no evidence to support the aerial dispersion theory.[26]  Likewise, EPA deleted the similar admission in its draft Fact Sheet.[27, 28]  When subsequently

---

[20] HSP 473, Defendants' Motion for Judgment on Liability for the Neighborhood at 4-5 (Oct. 19, 2000) (ECF 2602); HSP 474, Dhont Tr. at 427-29, 465-68 (May 26, 2000); HSP 475, Completion Report, Neighborhood Sampling Program, Harding Lawson Associates at §§ 1.2.3, 5.1.1 (March 2000) (2000 Trial Ex. 5113).

[21] HSP 474, Dhont Tr. at 429:7-19, 518:1-9 (May 26, 2000).

[22] HSP 476, Draft Fact Sheet #3 at 1 (July 6, 1999) (2000 Trial Ex. 5453).

[23] HSP 477, Draft Completion Report, Neighborhood Sampling Plan, Harding Lawson Associates at E-2 (Nov. 9, 1999) (2000 Trial Ex. 5125); HSP 474, Dhont Tr. at 521:5-19 (May 26, 2000).

[24] *See, e.g.,* HSP 478, Plaintiffs' Opposition to Defendants' Motion for Judgment on Liability re Stormwater Pathway and Neighborhood at 2 (Oct. 26, 2000) (ECF 2619).  "The Neighborhood" is the area bounded by Western Avenue, Del Amo Boulevard, Vermont Avenue, and Torrance Boulevard.  *Id.*

[25] HSP 474, Dhont Tr. at 429:20-25 (May 26, 2000).

[26] HSP 477, Draft Completion Report, Neighborhood Sampling Plan, Harding Lawson Associates at E-2 (Nov. 9, 1999) (2000 Trial Ex. 5125); HSP 474, Dhont Tr. at 521:5-19 (May 26, 2000); *compare* HSP 475, Completion Report at ES-2 (March 2000) (2000 Trial Ex. 5113).

[27] HSP 474, Dhont Tr. at 521:5-19 (May 26, 2000).

[28] Both incidents occurred in 1999, the same year defendants moved to sanction the United States for directing its experts to delete conclusions that hurt the

---

testifying under oath, however, EPA's 30(b)(6) designees (1) admitted that the differences between background areas and locations closer to the Montrose property were "very minimal," (2) agreed that even near-property concentrations were "not significantly different than the background levels in agricultural areas in California," and (3) acknowledged that the expected gradient of decreasing DDT concentrations from aerial dispersion did not exist.[29]  The court ultimately granted summary judgment in Montrose's favor and ruled that **Montrose could not be liable** for DDT contamination at the 204th Street site.[30]

Now, two decades later, the government is attempting to revive its aerial dispersion theory to try and hold Montrose liable for the South of Torrance Properties.  This theory is even less persuasive now than it was in 2000.  The 204th Street properties were located 1,343 feet from the Montrose property, yet the South of Torrance Properties are more than one-and-a-half times that distance away.[31] The 204th Street properties are located southeast of the Montrose plant, in the prevailing wind direction, yet the South of Torrance Properties are located almost directly south.[32] As with the 204th Street Site, there is also no evidence of a DDT "gradient" at the South of Torrance Properties, and the government does not assert

---

government's case.  HSP 479, Defendants' Motion for Sanctions Due to Government Misconduct (Apr. 30, 1999) (ECF 1565).  The Court ultimately struck multiple government experts, forbade their replacement with new experts, and precluded the government from recovering any costs associated with those experts. HSP 480, Minute Order (June 26, 2000) (ECF 2044).

[29] HSP 474, Dhont Tr. at 429:7-19, 518:1-9 (May 26, 2000); HSP 481, Montgomery Tr. at 424:5-23 (May 24, 2000).

[30] HSP 353, Order Granting Defendants' Motion for Summary Judgment regarding 204th Street and All Costs Associated Therewith at ¶ 2. (Sept. 20, 2000) (ECF 2448).  The Court also noted the government's waiver of response costs relating to its 204th Street investigation, which occurred after the government intentionally destroyed key evidence sought by Montrose in order to independently confirm EPA's claimed DDT test results.  *Id.* at ¶ 1.

[31] Johns Decl. ¶¶ 7-8.

[32] Johns Decl. ¶ 9.

otherwise.[33]  Rather than address these evidentiary deficiencies head-on, the government blithely asserts that aerial dispersion to the South of Torrance Properties is "uncontested" and acts as though its prior, failed efforts to prove this theory never occurred.

a.   **The U.S. Falsely Quotes Dr. Langseth**

Faced with the evidence that contradicts its aerial dispersion theory, the government next resorts to misrepresenting the testimony of Montrose expert Dr. David Langseth.  The government claims that "Dr. Langseth admitted that air transport of DDT from the Montrose DDT Plant 'certainly' contributed to the levels of DDT observed in soils of the Southern Pathway."[34]  This is false.  Instead, the government attorney deposing Dr. Langseth asked whether aerial dispersion "*could* have contributed to the observed conditions," *i.e.*, whether Dr. Langseth could speculate as to whether such a pathway were possible.  Dr. Langseth, in response, acknowledged that there *could* be "some contribution at some level, certainly."[35]  He went on to explain that there would be some dust generation from a working DDT manufacturer, but any sort of aerial deposition would be *de minimis*—a fact supported by EPA's own extensive investigation into its aerial dispersion theory.[36]  Moreover, Dr. Langseth never said that there were DDT impacts via aerial dispersion as far as the South of Torrance Properties.[37]

The government's assertion that there is no genuine dispute of material fact regarding its latest aerial dispersion theory is simply false.  EPA's own investigations and admissions amply demonstrate that its theory is false.  The

---

[33] HSP 474, Dhont Tr. at 429:7-19, 518:1-9 (May 26, 2000); HSP 481, Montgomery Tr. at 424:5-23 (May 24, 2000).

[34] Motion at 17.

[35] HSP 482, Langseth Tr. at 76:10-13.

[36] *Id.* at 76:17-77:1; *see also infra* at Section III(a)(3).

[37] HSP 482, Langseth Tr. at 76:17-77:1.

1  government cannot carry its burden through attorney speculation or by

2  mischaracterizing the testimony of a defense expert.  *Kalamazoo*, 228 F.3d at 1072

3  (plaintiff "bears the burden of proof to show that [defendant] did contribute");

4  *Asarco*, 21 F.Supp.3d at 807 ("a 'possible' migration pathway . . . is not a

5  'plausible' migration pathway.").

6                 *4.*    ***The Stormwater Deposition Theory Is Disputed***

7        The government's second causation theory is that DDT migrated from the

8  Montrose plant to the South of Torrance Properties via stormwater runoff.[38]

9  According to the government, because surface water conveyed DDT off the

10  Stauffer property and defendants admit that the Historic Stormwater Pathway

11  eventually passed through a portion of the South of Torrance Properties, "there is

12  no genuine dispute that DDT migrated to the South of Torrance Properties in

13  surface water runoff."[39]  Contrary to the government's claim, Montrose's experts

14  concluded that DDT from Montrose *did not* impact the South of Torrance

15  Properties.[40]  Once again, the government's argument ignores substantial evidence

16  and the admissions of its own witnesses.

17        If the government's stormwater deposition theory were correct, there should

18  be ample evidence of elevated DDT concentrations in the native soils of the

19  Historic Stormwater Pathway in and around the South of Torrance Properties.  Yet

20  there are not.  The parties have collected and analyzed literally hundreds of soil

---

22  [38] Motion at 14.

23  [39] *Id.* at 14-15.

24  [40] HSP 213, Expert Report of M. Johns at 18 (Mar. 13, 2020) ("[T]he non-native fill materials used to fill the ECI property are the source of the DDT.  The ECI property soil concentrations do not indicate floodplain transport of DDT during flow events.") ("Johns Report"); HSP 212, Expert Report of D. Langseth at 25 (Mar. 13, 2020) ("This statistical evaluation does not support the hypothesis that elevated [DDT compound] concentrations are associated with deposition in the historical stormwater pathway, and does support the alternative hypothesis – transport of [DDT compounds] to the historical stormwater pathway in fill.") ("Langseth Report").

1  samples, and nearly every soil sample with elevated DDT concentrations was
2  found in non-native "fill" material.[41]

3       The source of all of this DDT-contaminated "fill" is not a mystery—the
4  government has already documented and admitted the source.  Starting in the late
5  1960s the local government installed a large box drain, referred to as the Kenwood
6  Drain or Project 685, as part of a broader effort to improve stormwater transport
7  along the Historic Stormwater Pathway, resulting in what is now known as the
8  Current Stormwater Pathway.[42]  According to contemporaneous construction
9  documents, the government purchased over 200,000 cubic yards of material from
10  the Main Street Dump to use as "fill," and at least 17,000 cubic yards of that "fill"
11  were placed on top of the Kenwood Drain—enough to raise the surface elevation
12  in the South of Torrance Properties by up to 13 feet above the Kenwood Drain
13  itself.[43]  This is not seriously in dispute:  EPA investigated this issue decades ago
14  and concluded that "[a]pproximately 208,000 cubic yards… was purchased and
15  imported for backfilling" in connection with the Kenwood Drain project.[44]  The
16  government also investigated the Main Street Dump and found elevated levels of
17  DDT—42.7 ppm—in a composite sample.[45]  When questioned about the use of this
18  "fill" material, DTSC's 30(b)(6) witness admitted that there was no evidence it had

---

[41] See HSP 21, Earth Tech, Revised Soil Investigation Report, at 62-63 (June 20, 2008) ("It is important to note that none of the native soils was impacted by total DDT above the characterization benchmark [of 10 ppm]."); HSP 22, CH2M Hill, Draft Field Investigation Report, at Table 3-3, Tables 4-1 – 4-7 (Sept. 2008).

[42] This construction effort is more fully documented in Montrose's Motion for Partial Summary Judgment.  ECF 2992.

[43] HSP 238, Torrance Lateral Engineer Estimate, at 4 (June 25, 1969); HSP 215, Letter Agreement Between Equitable Savings & Loan Association and Los Angeles County Flood Control District (July 21, 1969); HSP 213, Johns Report at 17.

[44] HSP 93, EPA Remedial Investigation Report at 1-38 (May 18, 1998).

[45] HSP 483, Landfill Assessment Report, Strategic Engineering & Science, Inc. at Table 4-1 (Jan. 11, 2008).  Small amounts of soil from every boring taken at the site were combined and tested together in order to determine how the soil cores should be disposed.  Id. at 3-3.

MONTROSE'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT CASE NO. 2:90-cv-03122-DOC(GJSx)

undergone any chemical screening before use.[46]  While the government speculates that excavated materials were reused as backfill,[47] there is no evidence to indicate that actually occurred.[48]  Rather, the evidence indicates that all fill material was imported.[49]  For instance, the project specifications indicated that excavated material would not be suitable for backfill if it contained rubbish or debris, and the only pre-construction sampling on the ECI Property found asphalt and brick pieces in the top four feet of soil.[50]  Additionally, even EPA admits that imported fill was used because the excavated material was not suitable for reuse.[51]

### a.     The U.S. Falsely Quotes Montrose and its Experts

The government's attorneys simply ignore these prior investigations and admissions about imported fill material.  Indeed, the government fails to mention the words "fill" or "native" a single time in its Motion.  Similarly, the government's "Factual and Procedural Background" omits any reference at all to the Current Stormwater Pathway.[52]  Once again, the government attempts to ignore

---

[46] HSP 484, Hariri Tr. at 77:5-16; HSP 213, Johns Report at 17.

[47] Defendants have been released from any liability "related to" the Kenwood Drain, and would not be liable for any contamination in soils that had been excavated and backfilled as part of its construction.  *See* ECF 2992.

[48] HSP 354, Expert Rebuttal Report of Government Expert A. Medine at 8; HSP 485, Johns Tr. at 140:21-141:4.  Moreover, the government's experts cannot conclude that the fill material is from onsite sources that predate the construction of the Kenwood Drain. HSP 486, Hirmas Tr. at 239:21-240:3; HSP 487, Medine Tr. at 129:15-16.

[49] HSP 485, Johns Tr. at 188:10-11 ("[T]he preponderance of evidence showed me that the fill was from offsite sources[.]"); HSP 482, Langseth Tr. at 238:8-9 ("[I]t's more likely that the -- that the excavated material was not -- not reused as backfill.").

[50] HSP 166, Standards Specifications for Public Works Construction § 300-7.4 (1967); HSP 302, Soil Investigation, Converse, Davis and Associates at 4 ("Import of select material for backfilling appears warranted."), Drawing 5 (Sept. 6, 1968).

[51] HSP 93, EPA Remedial Investigation Report at 1-38 (May 18, 1998) ("[D]uring the earlier installation of the box drain, Kruse Construction had to stockpile the material because it was too wet, using imported fill.").

[52] *See* Motion at 5-12.

the evidence and simply mischaracterize the documents and the testimony of
Montrose's experts.

First, the government claims that Dr. Langseth "conceded that surface water
transport of DDT from the Montrose DDT Plant can explain at least some of the
elevated DDT concentrations found in the Southern Pathway."[53]  Not so.  When
asked whether he could "eliminate" the possibility of stormwater deposition, Dr.
Langseth replied that he could not "absolutely eliminate" that possibility, but
stressed that there was great "uncertainty" with that theory.[54]  Dr. Langseth then
emphasized—in the same answer—that "[y]ou can explain all of the exceedances
through imported fill…."[55]

Second, the government claims that Montrose experts admitted that flooding
occurred at the South of Torrance Properties, which resulted in "sedimentation"
and "overbank deposition of DDT," and that sampling confirmed the presence of
elevated DDT in these overbank areas.[56]  Again, this claim is false.  The
government expert advancing this "overbank flooding" theory, Dr. Hirmas,
admitted he had no evidence that overbank flooding actually occurred during
Montrose's period of operations and that he did not even consider historical
precipitation or flow data in forming his opinion.[57]  Montrose's expert, Dr.
Langseth, actually researched this issue and concluded that the 1947 to 1970 period
was "quite dry" and "it's unlikely that there were many, if any, overbank flooding
events during that particular period," with the possible exception of 1969.[58]

---

[53] Motion at 15.

[54] HSP 482, Langseth Tr. at 189:13-23.

[55] *Id.* at 190:1-4.

[56] Motion at 16-17.

[57] HSP 486, Hirmas Tr. at 244:3-8 ("I don't know whether it occurred.  I have no
evidence directly to assess whether it occurred or it didn't occur."); *id.* at 218:13-
219:2.

[58] HSP 482, Langseth Tr. 143:10-15.

Moreover, the only available sampling has confirmed the presence of elevated levels of DDT in fill materials, not in any native soils that would have been impacted by the government's hypothetical "overbank flooding" theory.[59]  The only possible exceptions are one or two samples in the CH2M Hill Draft Field Investigation Report for the Residential Properties, but that report is replete with errors and manipulations.[60]  And even if that were not the case, the government and its experts agree with Montrose that it is improper to draw any conclusions based on such isolated sample results, such that "one sample is not going to define a significant source to the contamination of the historic stormwater pathway and the southern pathway."[61]

Finally, the government claims that defendants have admitted that DDT from the Montrose Plant can "drain to the ocean via rivers and other run-off."[62]  This quote had nothing to do with the Montrose Plant or even the Historic Stormwater Pathway; it is from a 2000 brief discussing the "thousands of tons of DDT applied to the agricultural fields in Southern California."[63]

---

[59] *See* Johns Report at 17-18; HSP 21, Revised Soil Investigation Report, at 62-63 (June 20, 2008); HSP 22, CH2M Hill,  Draft Field Investigation Report, at Table 3-3, Tables 4-1 – 4-7 (Sept. 2008).

[60] Among other problems, EPA and its contractors reported inflated DDT results that were not supported by the underlying documentation, failed to correctly add DDT isomer results to arrive at accurate total reported DDT results, and omitted warnings from its own data validator—known as "N" flags—that many results might not even be DDT contamination.  *See, e.g.,* HSP 225, Review of Analytical Data, Tier 3, ICF International, at 4 (Mar. 8, 2007) (EPA9_0023237) (reported DDT results are "both qualitatively and quantitatively questionable" and "it is questionable whether the presence of [DDT] can be considered confirmed."); HSP 488, Husby Tr. 192:19-23; 194:1-21; 227:14-22.

[61] HSP 487, Medine Tr. at 82:8-11; *see also* HSP 489, Dhont Tr. at 124:5-14 (May 22, 2000) ("[S]olely on the basis of that sample alone. . . I don't know what else there would be that would directly tie it to the Montrose property."); HSP 490, Boehm Tr. at 92:9-93:5 ("I don't think you can take any one location, any one core, any one part of that core in isolation and say it's -- it's distinctly usable when the rest of it is not.").

[62] Motion at 17.

[63] HSP 371, Defendants' Memo. of Contention of Law and Fact at 9 (Aug 7, 2000) (ECF 2108).

1    Once again, the government's assertion that there is no genuine dispute of

2  material fact regarding its stormwater deposition theory is wrong.  The government

3  cannot carry its burden by ignoring the fact that virtually all elevated DDT in this

4  area is found in fill, and the **fill material was indisputably imported from a non-**

5  **Montrose source**.  Nor can the government overcome its evidentiary failures by

6  cherry-picking words and phrases from Montrose's experts and ignoring the

7  complete opinions advanced in their testimony.

8         **B.**    ***The Government Is Not Entitled to an Award of Costs***

9              1.    <u>**The Government Is Not Entitled to Summary Judgment on**</u>

10                  <u>**Operable Unit 6 Past Response Costs**</u>

11    The government seeks rulings on summary judgment that: (1) it has incurred

12  $3,676,565.52 in past response costs at Operable Unit 6 ("OU6") and (2) those

13  response costs "are presumed to have been incurred in a manner consistent with the

14  national contingency plan."[64]  The exact nature of the government's request is

15  somewhat vague.  It does not seek an award of costs at this time.  Nor does it seek

16  confirmation that its claimed costs were, in fact, incurred consistent with the

17  National Contingency Plan (the "NCP").  Instead, it appears to be after the kind of

18  forward-looking blank check this Court has already discouraged.[65]  Viewed most

19  favorably to the government, its motion seeks little more than an advisory opinion.

20    To the extent that the government simply seeks a technical ruling that it has

21  incurred $3,676,565.52 in claimed costs, defendants do not dispute the

22

23

─────────────────────

[64] Motion at 20.

[65] Status Conference Tr. at 46:21-47:6 (Feb. 21, 2020) (ECF 2956) (Mr. Allen:
"[W]hen we get . . . the declaratory judgment, we can come back for further
response costs and not have to relitigate it all over again."  The Court: "I know I
could do that, but I don't have to.  If you look at CERCLA – some of us get
concerned.  And that's why we have a monitor.  We want to make certain that
you're responding appropriately and promptly.  But we want to make certain your
costs are within reason.").

15

1  government's ticking and tying.[66]  On the other hand, if the government seeks a

2  substantive ruling on the recoverability of those purported response costs,

3  defendants are entitled to an opportunity at trial to demonstrate that the costs are

4  inconsistent with the NCP and therefore not recoverable.  Indeed, the government

5  itself agrees, recognizing that the presumption is a *rebuttable* one.[67]

6          2.      **The Government Has Not Established that the Response**

7                  **Costs Are Germane to the Location at Issue**

8          Among the many factual disputes with the government's claimed costs, an

9  important one is the basic geographic scope of its outlays.  Its claimed response

10  costs pertain to the entirety of OU6, despite the fact that its motion is concerned

11  only with liability for the South of Torrance Properties.  There is an obvious

12  disconnect between the costs that could potentially be determined at trial and the

13  narrower geographic scope of the government's motion.

14          Nearly four decades after it first established the Montrose Superfund Site,

15  the government has not yet defined the boundaries of OU6.[68]  Further, the

16  government's 30(b)(6) witness admits that the EPA has also not yet determined the

17  extent of any future investigation in OU6.[69]

18  _____

19  [66] The government asserts that a ruling in its favor could obviate the need "for up
    to five cost witnesses to testify at trial."  *See* Motion at 20, n. 7.  The government's

20  witnesses merely tabulated receipts provided by EPA and the Department of
    Justice ("DOJ"), and thereafter applied agency-specific indirect cost kickers

21  (averaging 190% for DOJ and 39.6% for EPA).  The arithmetic is not disputed, so
    there is no reason to call any of the government's witnesses, and certainly not five
    of them.

22  [67] *See* Motion at 5 ("The burden then shifts to Defendants to prove that the

23  response costs were incurred in a manner inconsistent with the NCP.").

    [68] HSP 471, Keydel 30(b)(6) Tr. at 16:1-25 ("Q. Why hasn't EPA made a

24  determination yet as to the boundaries of OU6?  A. Because we have not

25  completed the remedial investigation phase of our investigation which would
    inform the nature and extent of contamination that would inform the extent of the

26  operable unit.").

    [69] *Id.* at 145:1-5 ("[T]here is a possibility that a remedial investigation of the

27  historic stormwater pathway would step to [the Armco] property. That has not been
    determined yet, but it was envisioned as possible in the RI…").

28

Because there is a reasonable dispute of material fact as to the geographic boundaries of OU6, and the government apparently has no clue what it plans to do there, the government is not entitled to summary judgment as to its $3,676,565.52 in "past response costs at Operable Unit 6."[70]  Fed. R. Civ. Proc. 56(a).  And it certainly cannot establish entitlement to a declaratory judgement for future costs.[71]

3.     **There Are Disputed Issues of Fact As to Whether the Response Costs Incurred by the EPA Are Inconsistent with the NCP and Non-Recoverable**

At trial, defendants will demonstrate that the government's response costs are inconsistent with the NCP and therefore not recoverable.  For purposes of summary judgment, it is clear that numerous disputes of material fact exist regarding the response costs incurred by EPA and its contractors.

As the government agrees, the presumption that applies to the consistency of the government's response costs with the NCP is rebuttable.  *Supra* n. 67.  "Costs that are unnecessary and excessive in light of the [NCP] are arbitrary and capricious and should be disallowed[.]"  *United States v. E.I. Dupont De Nemours & Co.*, 432 F.3d 161, 179 (3d Cir. 2005) (citing *Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1025 (8th Cir. 1998)); *see also Washington State Dept. of Transp. v. Washington Natural Gas. Co., Pacificorp*, 59 F.3d 793 (9th Cir. 1995) (government response costs found to be arbitrary and capricious because of agency failures to assess the nature and extent of the threat posed by hazardous substances at the site, consider the importance of additional contaminated material discovered at the site, and appropriately evaluate alternative response actions).

The evidence demonstrates that EPA and its contractors' actions in the Southern Pathway were, in many instances, unnecessary and excessive.  CH2M

---

[70] Motion at 20.

[71] *Id.* at 23.

1   Hill, EPA Region 9's standby contractor, performed most of the work, and its fees

2   alone account for the overwhelming bulk of the EPA's claimed costs:

3   approximately $2 million out of $3.5 million.[72]  CH2M Hill's investigation was

4   well over budget, did not even yield a final report, and was rife with error.[73]

5   Despite this, EPA saw fit to award CH2M Hill a performance bonus.[74]

6          Critically, the NCP requires EPA to prepare a conceptual site model

7   ("CSM") before undertaking an investigation.[75]  Here, however, CH2M Hill did

8   not prepare a CSM until more than two years *after* the fieldwork had been

9   completed.[76]  EPA's failure to timely develop its CSM—as the regulations require

10  –caused the scope of the investigation to go off the rails.[77]  EPA's contractor

11  embarked on enormously expensive tasks that did not further the investigation,

12  such as collecting borings down to a depth of 24 feet below ground surface

13  ("bgs").  By the EPA's own admission, contamination below 16 feet bgs posed no

14  risk to human health because residents would be unlikely to come into contact with

15  such deep soils.[78]  Another example was hiring an airplane to photograph

---

[72] HSP 471, Keydel 30(b)(6) Tr., at 89:13-15; HSP 220, Expert Report of A. Daus at 7 (Mar. 13, 2020) ("Daus Report").

[73] HSP 220, Daus Report at 16; *see also infra at* n. 85-87.

[74] HSP 220, Daus Report at 17; HSP 384 at EPA-COST0000024.  At the same time that CH2M Hill was working at the South of Torrance Properties, it was overbilling the government on environmental contracts.  HSP 491, *CH2M Hill Hanford Group Inc. Admits Criminal Conduct, Parent Company Agrees to Cooperate in Ongoing Investigation and Pay $18.5 Million to Resolve Civil and Criminal Allegations*, U.S. Department of Justice (Mar. 7, 2013), https://www.justice.gov/opa/pr/ch2m-hill-hanford-group-inc-admits-criminal-conduct-parent-company-agrees-cooperate-ongoing.  "Costs that arise from fraud . . . are not recoverable[.]" *United States v. Kramer*, 913 F. Supp. 848, 863 (D.N.J. 1995).

[75] 40 C.F.R. § 300.430(b)(2).

[76] HSP 220, Daus Report at 9;  HSP 26, Human Health Risk Assessment at Figure 3 (Sept. 2008) (EPA9_0587109-12).

[77] HSP 220, Daus Report at 9.

[78] HSP 471, Keydel 30(b)(6) Tr., at 162:3-10.  In a typical residential human health risk assessment, samples would not be taken below 10 or 12 feet bgs.  *See, e.g.,* HSP 492, Use of California Human Health Screening Levels in Evaluation of

1    approximately 1,000 acres, when only 1.7 acres were actually under

2    investigation.[79]

3         The NCP also requires EPA to "manage remedial or other response actions

4    at NPL [National Priority List] sites"[80] and EPA guidance states that it is EPA

5    managers' "responsibility to develop realistic cost estimates, monitor and control

6    contract expenditures, and manage changing site conditions within the allocated

7    budget."[81]  EPA failed conclusively in this regard, and did not even track CH2M

8    Hill's efforts and costs incurred against its projected budget until April 2008, *two*

9    *years* into its work at the Residential Properties.[82] At that point, it was too late:

10   CH2M Hill was already drastically over budget, and had incurred over $1.8 million

11   in costs, 95 percent of its total costs charged for the entire project.[83]

12        EPA hired CH2M Hill to conduct the investigation of the Residential

13   Properties.[84]  Despite being paid approximately $2 million, it never produced a

14   final report, and the draft report it did produce was riddled with errors.[85]  The most

15   egregious of these were in relation to the R-15 sample at the 16 to 20 foot interval,

16   which was analyzed no less than twelve times.[86]  CH2M Hill chose to include in its

17   report only the two highest DDT values in order to inflate the apparent amount of

18

19   Contaminated Properties, California Environmental Protection Agency at 2-6 (Jan. 2005).

20   [79] HSP 220, Daus Report at 9-10; HSP 493, Work Plan Addendum, CH2M Hill at EPA9_0000522 (Nov. 2006).

21   [80] 40 C.F.R. § 300.120(a).

22   [81] HSP 494, Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA § 1.8 (Oct. 1988).

23   [82] HSP 220, Daus Report at 16.  EPA's Remedial Project Manager overseeing the
24   work was Susan Keydel, herself a former CH2M Hill employee who previously worked on the Montrose Site while employed at that firm.  HSP 495, Keydel Percipient Tr. at 18:2-5.

25   [83] *Id.* at 16.

26   [84] HSP 22, Draft Field Investigation Report at 1-1 to 1-2 (Sept. 2008).

27   [85] HSP 471, Keydel 30(b)(6) Tr. at 87:9-88:18, 91:25-92:3; *see supra* n. 60.
     [86] HSP 490, Boehm Tr. at 132:18-133:6.

28

1  DDT contamination, despite the fact that those values were an order of magnitude

2  higher than any of the other ten runs and resulted from uncontrolled laboratory

3  contamination.[87]  It is highly questionable whether this manipulation can even be

4  considered a response cost.

5    Despite the unfinished report and dubious analytical procedures, EPA made

6  the inexplicable decision to award CH2M Hill a "Performance (Award) Fee"—a

7  bonus of $85,912 which, after imposition of EPA's indirect cost multipliers,

8  amounted to **$126,901**.[88]  EPA failed to provide ***any*** documentation to support its

9  decision to award such a bonus, which is plainly unwarranted given CH2M's

10  repeated failings at the Southern Pathway.[89]  Instead, EPA's "expert" merely

11  opines that a "Performance Award Contract" is an appropriate form of contract,

12  and thus, whatever the EPA deems appropriate should not be questioned.[90]

13    Based on all of this, the $3,562,950.24 in "response costs" allegedly incurred

14  by EPA should not be decided on summary judgment.

15      4. **The Government's Request for a Ruling that its Costs are**

16       **Presumed Consistent with the NCP Is Improper**

17      *a.* ***The Government Seeks an Advisory Opinion on EPA's***

18       ***Claimed Costs***

19    As a legal matter, if it is able to make out a *prima facie* case for liability

20  under CERCLA section 107, the EPA is generally entitled to a presumption that its

21  non-litigation response costs are consistent with the NCP.  *United States v.*

22

23  [87] *See* HSP 225, Review of Analytical Data, Tier 3, ICF International at 5-6 (Mar.

24  8, 2007) (EPA9 0023238) ("The laboratory stated, in the response to regional
    request [sic], that the disparity in results between the first extraction and re-

25  extraction may be due to contamination problems with the first extraction batch
    and sample nonhomogeneity. As a ***conservative approach***, the ***higher results*** . . .

26  are reported in Table IA.") (emphasis added).

    [88] HSP 220, Daus Report at 17-18.

27  [89] *Id.*

28  [90] HSP 219, Rebuttal Report of Government Expert W. Wright at 8.

*Chapman*, 146 F.3d 1166, 1170-71 (9th Cir. 1998).  This is just a restatement of the law.  A ruling confirming this would not address any "genuine adversary issue," and hence would be an improper advisory opinion and not a proper subject for summary judgment.  *See, e.g.*, *Center for Biological Diversity v. U.S. Forest Service*, 925 F.3d 1041, 1048 (9th Cir. 2019).  For the reasons discussed above, the government cannot make out a *prima facie* case for liability, and so no presumption attaches.

> **b.     The Government's Litigation Costs Are Not Entitled to any Presumption**

The government's motion troublingly conflates EPA's claimed costs with the Department of Justice's ("DOJ"), despite the fact that litigation costs and non-litigation costs are subject to much different legal standards.  Here, the government seeks Court approval for more than $113,000 in attorney fees for August and September 2019 alone, and unknown amounts outside of that two-month period by way of its request for a declaratory judgment.  DOJ's prosecution of this lawsuit over the last months should give the Court serious pause in approving *any* award.

First, the law: the government asks the Court to find that *all* of its response costs are presumed consistent with the NCP, but this is contrary to law insofar as it extends to litigation costs.  Government litigation costs are not subject to any presumption, and it remains the burden of the government to justify an award. *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 953 (9th Cir. 2002) ("We have held above that [the government] is entitled to the presumption of consistency bestowed . . . by the phrase 'not inconsistent with the national contingency plan' . . . . A similar result, however, is not called for with respect to attorney's fees."); *see also Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (finding that the fee applicant "bears the burden of establishing entitlement to an award[.]").  Further, the

government must be the prevailing party in order to recover.  *Chapman*, 146 F.3d at 1175.  Here, of course, there is not yet any "prevailing party."

If the day ever comes that the Court determines the government is the "prevailing party," it will have "discretion in determining the amount" of reasonable attorney fees to be awarded."  *Chapman*, 146 F.3d at 1176 (quoting *Hensley*, 461 U.S. at 437).  The record here amply demonstrates why this is so, as the government's claimed fees are plainly unreasonable.  In only two months, DOJ allegedly spent 724.25 hours on the case, including an incredible 444.5 hours by one attorney, Gabriel Allen.[91]  Between August 2 and August 12, 2019 alone, Mr. Allen reported spending more than 80 hours drafting a *joint* status report and preparing for a status hearing.[92]  Just a few weeks later, between September 10 and 25, he spent upwards of 70 hours preparing for oral argument on Montrose's Motion to Reopen Discovery.[93]  That hearing was ultimately cancelled and the motion granted on the papers.  In addition to billing unreasonable hours on those specific tasks, DOJ also failed to provide any description whatsoever for more than 250 additional hours during this two-month window.[94]  Without any explanation of what work was done, the Court cannot properly assess whether the time spent was reasonable.  Moreover, some claimed fees have no relation at all to the South of Torrance Properties, such as "draft[ing] briefs on TFCF America, Inc.'s liability."[95]  This Motion is not directed at TFCF America and, in any event, the Court has not

---

[91] DOJ's claimed average attorney hourly rate is roughly $52.  *See* HSP 199, DOJ ENRD Time by Employee Report at 3, 5; Kime Decl. in Support of Plaintiffs' Motion for Partial Summary Judgment ¶ 19.c (ECF 2991-14).  However, DOJ applies a 202.51 percent multiplier to all attorney costs, effectively making the hourly rate over $150 per hour.  *See Id.* ¶ 18 (ECF 2991-14).

[92] HSP 200, DOJ Time Detail by All Reporters at DOJ-COST000007-08.

[93] *Id.* at DOJ-COST000004-5.  DOJ Attorney Coleman spent a further 50 hours preparing for the same oral argument.  *Id.* at DOJ-COST000008-000009.

[94] *Id.* at DOJ-COST000010-13.

[95] Motion at 12.

1   yet ruled on that defendant's liability, so the government cannot presently be a

2   prevailing party.

3       DOJ's approach to the litigation over the past year calls into serious question

4   whether it is exercising any oversight over its spending.  For example, three or

5   more government attorneys have typically attended every deposition in this case.

6   In a particularly egregious example, at the deposition for the expert charged with

7   testifying about DOJ's own costs, there were ten government attendees, as opposed

8   to just one attorney for all defendants.[96]

9       In short, there remain serious disputed issues of material fact as to whether

10  the government's claimed litigation costs and attorney fees are reasonable and

11  therefore recoverable.  Fed. R. Civ. Proc. 56(a); *Anderson*, 477 US at 248; *Fresno*

12  *Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).

13         5.    **The Government Is Not Entitled to a Declaratory Judgment**

14              **for Future Response Costs**

15      Because it cannot establish defendants' liability for the South of Torrance

16  Properties, the government is not entitled to a declaratory judgment for future

17  costs.  *See*  42 U.S.C. § 9613(g)(2).  Further, the government's requested relief is

18  overbroad.  It seeks an order that is "binding on any other subsequent action or

19  actions to recover further response costs or damages *related to* the South of

20  Torrance Properties."[97]  Even if it were successful on summary judgment, the

21  government would only be entitled to a judgment for future costs incurred *at* the

22  South of Torrance Properties.  CERCLA is not intended to grant the government

23  such a "blank check" to conduct unending response actions.  *In re Bell Petroleum*

24  *Services, Inc.*, 3 F.3d 889, 907 (5th Cir. 1993).  Congress cannot have intended "to

25  give the EPA such unrestrained spending discretion."  *Id.*  The government cannot

26

27  [96] HSP 496, Kime Tr. at 3:3-4:14.

28  [97] [Proposed] Order at 6 (ECF 2991-15) (emphasis added).

1   seek liability for only a narrow area, and then try to "shoehorn in" costs for other

2   locations on the basis that they are "related" to the South of Torrance Properties.

3   **C.    The Release Provided in the Current Stormwater Pathway Consent**

4   **Decree Precludes Summary Judgment**

5   As set forth in Montrose's own motion for partial summary judgment, were

6   the Court to agree with the government's characterization of defendants' liability

7   with respect to the South of Torrance Properties, that liability was already settled

8   under the Current Storm Water Pathway Consent Decree ("Consent Decree").[98]

9   The Consent Decree, in unambiguous terms, "finally and fully resolve[d] all

10   present and future liability of [defendants] … for Response Costs *relating to* the

11   Current Storm Water Pathway," which included the Kenwood Drain.[99]  The

12   Consent Decree thereby resolved defendants' liability for all response costs

13   "connected" to or "standing in relation" to the construction of the Kenwood Drain.

14   *See Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854,

15   868 (1993) (citing Black's Law Dict., at 1288 (6th ed. 1990)).

16   The government cannot now seek to impose liability for response costs that

17   it has already maintained are related to the construction of the Kenwood Drain.

18   EPA's Rule 30(b)(6) witness as well as its own expert contended that the DDT-

19   contaminated soils in the vicinity of the Historic Stormwater Pathway were the

20   result of disturbance, excavation, and backfilling coincident with the installation of

21   the Kenwood Drain.[100]  These DDT-contaminated soils clearly relate to the Current

---

23   [98] ECF No. 2992.

   [99] HSP 458, ECF No. 2687, ¶¶ L, 5.A, 7 (emphasis added).

25   [100] *See* HSP 471, Keydel 30(b)(6) Tr. at 83:24-84:15 ("I have not come across any information other than the box drain disturbance and subsequent soil disturbance as the cause for elevated DDT at the ECI property."); HSP 354, Expert Rebuttal Report of Government Expert A. Medine, at 10 (contending that the impact of the Kenwood Drain installation on DDT contamination in the Historic Stormwater Pathway "was not limited only to the excavation and backfilling of DDT-contaminated soils over and around the drain" but also extended to the Residential Properties).

1    Stormwater Pathway, and thus any related response costs were resolved by the

2    Consent Decree.

3            If the Court holds that the Consent Decree did not resolve all of defendants'

4    liability for DDT-contaminated soils in the Historic Stormwater Pathway, the

5    existence of the Consent Decree still raises a disputed question of fact as to which

6    portions of the Historic Stormwater Pathway were released, and to what extent that

7    release impacts EPA's cost claims.  Therefore, summary judgment as to the

8    government's response costs is not warranted for this additional reason.

9    **IV.    <u>CONCLUSION</u>**

10           There are threshold disputes of material fact on every aspect of the

11   government's motion.  Accordingly, Montrose respectfully requests that the

12   government's Motion for Partial Summary Judgment be denied.

13

14   Dated:  September 25, 2020          Respectfully submitted,

15                                       LATHAM & WATKINS LLP

16

17                                       By  /s/ Kelly E. Richardson
                                             Kelly E. Richardson
18                                           Attorneys for Defendant
                                             Montrose Chemical Corporation of
19                                           California

20

21

22

23

24

25

26

27

28