2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

1

1      **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4              - - - - - - -

5

6    UNITED STATES OF AMERICA, et       )
     al.,                               )
7                                       )        **CERTIFIED**
             Plaintiffs,                )
8                                       )
        vs.                             ) No. 2:90-CV-03122-DOC
9                                       )     Item Number 2
     MONTROSE CHEMICAL CORPORATION OF   )
10   CALIFORNIA, et al.,                )
                                        )
11           Defendants.                )
     _____   )
12                                      )
     And related cross-actions.         )
13   _____   )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17      Hearing on Motions [3055], [3057], [3062], [3063]

18              Santa Ana, California

19           Tuesday, September 28, 2021

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25

1    **APPEARANCES:**

2    FOR PLAINTIFF UNITED STATES OF AMERICA:

3         Deborah Gitin
         U.S. DEPARTMENT OF JUSTICE
4         Environmental Enforcement
         Environment and Natural Resources Division
5         450 Golden Gate Avenue, Suite 07-6714
         San Francisco, California 94102
6         415-744-6488
         deborah.gitin@usdoj.gov

7

8    FOR PLAINTIFF STATE OF CALIFORNIA, on behalf of Department
     of Fish & Game, State Lands Commission & Department of Parks
9    & Recreation:

10

         Megan Kathryn Hey
11        Office of the Attorney General
         OFFICE OF ATTORNEY GENERAL
12        CALIFORNIA DEPARTMENT OF JUSTICE
         300 South Spring Street, Suite 1702
13        Los Angeles, California 90013
         213-269-6344
14        megan.hey@doj.ca.gov

15   ALSO PRESENT:

16        Dustin Minor, EPA representative

17        Vivian S. Murai, EPA representative

18

19

20

21

22

23

24

25

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 3 of 97  Page ID
#:15613
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

3

1    **APPEARANCES (CONTINUED):**

2    FOR DEFENDANT MONTROSE CHEMICAL CORPORATION OF CALIFORNIA:

3        Kelly E. Richardson
         LATHAM & WATKINS LLP
4        12670 High Bluff Drive
         San Diego, California 92130
5        858-523-5400
         kelly.richardson@lw.com
6
         Benjamin D. Gibson
7        LATHAM & WATKINS LLP
         12670 High Bluff Drive
8        San Diego, California 92130
         858-524-5400
9        benjamin.gibson@lw.com

10       John Thomas (Jake) Ryan
         LATHAM & WATKINS LLP
11       12670 High Bluff Drive
         San Diego, California 92130
12       858-523-5400
         jake.ryan@lw.com

13

14   FOR DEFENDANT STAUFFER MANAGEMENT COMPANY (as successor to
     ATKEMIX THIRTY-SEVEN, INC.):
15
         J. Wylie Donald (pro hac vice)
16       McCARTER & ENGLISH LLP
         405 North King Street, 8th Floor
17       Wilmington, Delaware 19801
         302-984-6361
18       jdonald@mccarter.com

19

20

21

22

23

24

25

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 4 of 97  Page ID
#:15614
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

4

1    **APPEARANCES (CONTINUED):**

2    FOR DEFENDANT TFCF AMERICA, *formerly known as 21st CENTURY
     FOX AMERICA, INC.* (successor to CHRIS-CRAFT INDUSTRIES,
3    INC.:

4         Winston Ping Hsiao
          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
5         300 South Grand Avenue, Suite 3400
          Los Angeles, California 90071
6         213-687-5000
          winston.hsiao@skadden.com
7

8         Jose R. Allen
          SKADDEN ARPS SLATE MEAGHER & FLOM LLP
9         525 University Avenue, Suite 1100
          Palo Alto, California 94301
10        650-470-4500
          jrallen@skadden.com
11

12   DEFENDANT WESTINGHOUSE ELECTRIC CORPORATION:
     (none)
13
     DEFENDANT RHONE-POULENC BASIC CHEMICALS CO.:
14   (none)

15   DEFENDANT COUNTY SANITATION DISTRICT NO. 2 OF LOS ANGELES
     COUNTY:
16   (none)

17   DEFENDANT AVENTIS CROPSCIENCE:
     (none)
18

19   SPECIAL MASTER:

20        Hon. James L. Smith
          JAMS INC
21        5 Park Plaza, Suite 400
          Irvine, California 92614
22        714-937-8229
          jsmith@jamsadr.com
23

24

25

| | | |
|---|---|---|
| 1 | **I N D E X** | |

| | | |
|---|---|---|
| 2 | **PROCEEDINGS** | **PAGE** |
| 3 | HEARING ON MOTIONS | |
| 4 | Appearances | 7 |
| 5 | Initial Remarks by the Court | 9 |
| 6 | Response by Ms. Gitin | 23 |
| 7 | Response by Mr. Richardson | 25 |
| 8 | Further Remarks by the Court | 27 |
| 9 | Court's inquiry | 44 |
| 10 | Comments by Ms. Gitin | 47 |
| 11 | Court's Inquiry re TBA | 56 |
| 12 | Court's Inquiry re TI Waiver Zone | 58 |
| 13 | DAAC Questions Re TCE and Benzene Plumes | 60 |
| 14 | Court's Tentative Findings | 65 |
| 15 | Comments by Ms. Gitin | 66 |
| 16 | Comments by Mr. Richardson | 66 |
| 17 | Court's remarks/questions re Southern Pathway | 68 |
| 18 | Court's Inquiry re DAAC Comment Re Scope of RI | 83 |
| 19 | Court's Inquiry re RI Work Plan | 92 |
| 20 | Court's Inquiry re Risk Assessment | 95 |

| | |
|---|---|
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Certified for the U.S. District Court CM/ECF**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

6

                    SANTA ANA, CALIFORNIA, TUESDAY, SEPTEMBER 28, 2021

                                    Item Number 2

                                    (8:53 a.m.)

08:53          THE COURT:  Good morning.  How is everyone?

08:53          I know you from prior meetings, but that was quite
a while ago.  And Judge Standish has been, I know, in
constant communication and relaying information to me.

08:53          And before we start, I want to thank all of you
for your input to the magistrate judge.  It's very much
appreciated.  After 30 years of litigation, it's hopefully a
productive session today.

08:54          Judge Standish could not join us.  She's been on
the front line with all of you and then has been conveying
information to the Court.  And she may be able to join us,
if necessary; but hopefully all the questions will be
revolved today.

08:54          So, Counsel, if you would be so kind -- this is
now called to order, and it's entitled United States of
America and the State of California v. Montrose Chemical
Corporation, et al., with numerous parties, of course, who
can identify themselves on the record.

08:55          On behalf of the plaintiff in this matter, just
remain seated.  Use the microphone, if you will.  Bring it
down towards you.

08:55          The locations you sit at were cleaned last evening

1    by the custodians, but when you leave today -- we have other

2    matters -- would you just kindly clean the area.  'Cause I

3    don't want my staff coming over and doing that.  Also you're

4    welcome to socially distance yourself.  I want you to be

5    comfortable.  But just take care of that area because we

6    can't.  Otherwise, I'm sending Karlen out to do that and

7    then we've got other parties.  So once a day isn't

8    sufficient.

08:55   9         So, Counsel, on behalf of the government, please.

08:55   10                        **APPEARANCES**

08:55   11        MS. GITIN:  Good morning, Your Honor.  My name is

12   Deborah Gitin, and I represent the United States.  I'm with

13   the U.S. Department of Justice Environmental Enforcement

14   Section, on behalf --

08:55   15        THE COURT:  And I spoke to you, as well the

16   parties involved, I believe, between Christmas, New

17   Year's --

08:55   18        MS. GITIN:  That's correct, Your Honor.

08:55   19        THE COURT:  -- to inform all parties of that

20   conversation during the holiday season.  I want to thank you

21   for your input.

08:56   22        Counsel.

08:56   23        MS. HEY:  Good morning, Your Honor.  Megan Hey.

24   I'm with the California Attorney General's Office

25   representing the California Department of Toxic Substances

| | | |
|---|---|---|
| | 1 | Control. |
| 08:56 | 2 | THE COURT:  Pleasure. |
| 08:56 | 3 | And the gentleman with you? |
| 08:56 | 4 | MS. GITIN:  And also present with me is Dustin |
| | 5 | Minor.  He's agency counsel, Assistant Regional Counsel at |
| | 6 | EPA. |
| 08:56 | 7 | THE COURT:  Okay. |
| 08:56 | 8 | Counsel, do you want to begin with Montrose? |
| 08:56 | 9 | MR. RICHARDSON:  Good morning, Your Honor.  Kelly |
| | 10 | Richardson with Latham & Watkins for Montrose. |
| 08:56 | 11 | THE COURT:  And you represent? |
| 08:56 | 12 | MR. RICHARDSON:  Montrose Chemical. |
| 08:56 | 13 | MR. RYAN:  Good morning, Your Honor.  Jake Ryan of |
| | 14 | Latham & Watkins for Montrose. |
| 08:56 | 15 | THE COURT:  All right. |
| 08:56 | 16 | MR. GIBSON:  Good morning, Your Honor.  Ben Gibson |
| | 17 | with Latham & Watkins for Montrose. |
| 08:56 | 18 | MR. HSIAO:  Winston Hsiao for Defendant |
| | 19 | TFCF America, Inc. |
| 08:56 | 20 | THE COURT:  All right.  Thank you. |
| 08:56 | 21 | MR. ALLEN:  Good morning, Your Honor.  Jose Allen |
| | 22 | for Defendant TFCF America Inc. |
| 08:57 | 23 | MR. DONALD:  Good morning, Your Honor.  Wylie |
| | 24 | Donald, McCarter & English, representing Stauffer Management |
| | 25 | Company LLC, for itself, and as litigation agent for |

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

9

| | 1 | Defendant Bayer CropScience, Inc. |
|---|---|---|
| 08:57 | 2 | THE COURT: Okay. |
| 08:57 | 3 | Are there any persons present in the Court -- and |
| | 4 | the Court took the added precaution of sending out an |
| | 5 | email -- with Del Amo today? |
| 08:57 | 6 | MS. GITIN: No, Your Honor. |
| 08:57 | 7 | THE COURT: Also the -- some of the state agencies |
| | 8 | involved, such as the Water Board? |
| 08:57 | 9 | MS. HEY: No, Your Honor. |
| 08:57 | 10 | THE COURT: Okay. |
| 08:57 | 11 | Well, then, Counsel, why don't you make your |
| | 12 | presentation, but let me briefly summarize the 30 years of |
| | 13 | litigation as follows: |
| 08:57 | 14 | **INITIAL REMARKS BY THE COURT** |
| 08:57 | 15 | THE COURT: Consent decrees have been lodged with |
| | 16 | the Court, and put out for public comment in the Federal |
| | 17 | Register. The plaintiffs have considered these comments and |
| | 18 | have moved the Court to enter all three consent decrees. |
| 08:57 | 19 | These unopposed motions, of which defendants have |
| | 20 | joined, have been submitted to this Court and are ripe for |
| | 21 | the Court's consideration and potential approval. |
| 08:58 | 22 | There are three consent decrees before the Court: |
| 08:58 | 23 | The Q&M [sic] consent decree. This is a partial |
| | 24 | consent decree which commits the defendants, together with |
| | 25 | one other settling defendant, who's not a party -- |

08:58   1          And would you identify yourself, Counsel, once

2     again and the entity you represent.

08:58   3          MR. DONALD:  Bayer CropScience and Stauffer

4     Management Company.

08:58   5          THE COURT:  And with TC...?

08:59   6          MR. ALLEN:  TFCF America, Inc.

08:59   7          THE COURT:  Okay.  Thank you.

08:59   8          -- in this case, and TC- -- or TFCF, who, in a

9     sense, is not the party; is that correct?

08:59   10         MS. GITIN:  TFCF America is a party to the case.

11    You may've known them as Fox or 21st Century Fox.

08:59   12         There's one settling defendant in that first

13    consent decree.  The O&M consent decree, who's not a party

14    to this case.

08:59   15         THE COURT:  Who that?

08:59   16         MS. GITIN:  Jones -- JCI Jones Chemicals.

08:59   17         THE COURT:  Thank you very much.

08:59   18         MS. GITIN:  I don't believe they have counsel here

19    today.

08:59   20         THE COURT:  And this is to perform long-term

21    operation and maintenance, the Q&M [sic] of the

22    chlorobenzene plume groundwater remedy at the dual site

23    operable unit of the Montrose site.

08:59   24         And you've referred to that consistency --

25    consistently throughout the years as "dual" because the

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

11

| | | |
|---|---|---|
| | 1 | groundwater contamination stems from both the Montrose site |
| | 2 | and the adjacent superfund site; correct? |
| 09:00 | 3 | MS. GITIN:  That's correct, Your Honor. |
| 09:00 | 4 | There are two superfund sites in the area.  The |
| | 5 | Montrose site, which is the subject of this litigation, and |
| | 6 | the Del Amo site, which is the subject of separate |
| | 7 | litigation -- |
| 09:00 | 8 | THE COURT:  And the -- |
| 09:00 | 9 | MS. GITIN:  -- at the dual site. |
| 09:00 | 10 | The only thing I wanted to correct is it's the |
| | 11 | "O&M," rather than Q&M.  I'll try to stay as light as I can |
| | 12 | on the acronyms. |
| 09:00 | 13 | THE COURT:  Did I say "Q"?  I'm sorry.  I meant |
| | 14 | "O." |
| 09:00 | 15 | MS. GITIN:  "O&M" is for Operation and |
| | 16 | Maintenance. |
| 09:00 | 17 | THE COURT:  Of course. |
| 09:00 | 18 | Defendants have already constructed or performed |
| | 19 | construction of this remedy pursuant to a 2012 consent |
| | 20 | decree entered in this case, which you've referred to as the |
| | 21 | Construction Consent Decree, which is ECF Number 2735, and |
| | 22 | Paragraph 7 of the stipulation. |
| 09:01 | 23 | The O&M Consent Decree is valued at an estimated |
| | 24 | $52.6 million.  And defendants will also pay $4 million to |
| | 25 | the United States and $177,265.36 to DTSC for past response |

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

12

```
 1   costs at the dual site.  The O&M Consent Decree was lodged
 2   with this Court on August 6th of 2020, which is ECF
 3   Number 2987.
 4           And I want you to correct me in case the
 5   statements I'm making from our research is incorrect.
 6           There's been one public comment received and the
 7   plaintiffs moved to enter the O&M Consent Decree on
 8   April 7th of 2021.
 9           MS. GITIN:  Your Honor, one small correction.
10           There were two comments received on that consent
11   decree.
12           THE COURT:  That's correct.  You're absolutely
13   right.  And we'll go through those in just a moment.
14           MS. GITIN:  Certainly.
15           THE COURT:  Defendant submitted a joinder on
16   April 8th, 2021, in ECF Number 3057.  And plaintiffs noticed
17   a May 17, 2021, motion hearing for the O&M Consent Decree,
18   but the Court reset that hearing date "to be determined" and
19   then you gave me three dates, and I chose the latter date in
20   the September dates you'd given me.
21           In addition, the same dates, you submitted the
22   DNAPL Consent Decree.
23           This partial consent decree commits the defendants
24   to perform the cleanup of the DNAPL, which is the Dense
25   Nonaqueous Phase Liquid contamination that resides primarily
```

09:01  4
09:01  6
09:02  9
09:02  10
09:02  12
09:02  14
09:02  15
09:03  21
09:03  23

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 13 of 97   Page ID
#:15623
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

13

1    under the footprint of the former Montrose plant property at

2    an estimated cost of $25 million.

09:03    3    Defendants will also pay $347,000 to the

4    United States, and $61,798.11 to DTSC for certain past

5    response costs related to this portion of the site.

09:04    6    The DNAPL Consent Decree was lodged with the Court

7    on January 15th of 2021, and that should be ECF Docket

8    Number 3050.  And no public comments were received at that

9    time.  And plaintiffs moved to enter the DNAPL Consent

10    Decree on April 7, 2021, in the same motion in which

11    plaintiffs moved to enter the O&M Consent Decree.  But now I

12    do believe we have public comments, don't we?

09:04    13    MS. GITIN:  We have two public comments on the

14    first consent decree, the O&M Consent Decree, but no public

15    comments on the second one.

09:04    16    THE COURT:  And plaintiffs noticed this, of

17    course, for May 17th.  And I chose to bring you together at

18    one time, to save the travel expenses and inconvenience.

19    That's why I had all three consent decrees.

09:04    20    Then, on the Southern Pathway Consent Decree, this

21    partial consent decree commits defendants to perform the

22    remedial investigation and feasibility study in the Southern

23    Pathway portion of the site.  This is also known as the

24    Historic Stormwater Pathway South.  This is the area of the

25    site for which liability and costs have been disputed.  And

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | this was at issue in the now-vacated trial between the               |
|       | 2  | parties.                                                             |
| 09:05 | 3  | Under the investigation and study completed under                    |
|       | 4  | the Southern Pathway Consent Decree, it is unknown whether a         |
|       | 5  | remedy for the Southern Pathway will be required.  That's            |
|       | 6  | why the impetus to at least begin this process that's been           |
|       | 7  | in abeyance for decades.                                             |
| 09:05 | 8  | MS. GITIN:  Correct, Your Honor.                                      |
| 09:05 | 9  | THE COURT:  And this work is valued at an                            |
|       | 10 | initially estimated $518,000.  Defendants will also pay              |
|       | 11 | $3,750,000 to the United States and $250,000 to DTSC for             |
|       | 12 | past costs primarily related to this portion of the site.           |
| 09:06 | 13 | The Southern Pathway Consent Decree was lodged                       |
|       | 14 | with the Court on May 12, 2021, which should be ECF Docket           |
|       | 15 | Number 3054.  There were public comments received.  And the         |
|       | 16 | plaintiffs have moved to enter the Southern Pathway Consent          |
|       | 17 | Decree on June 3rd, 2021, in ECF Number 3062.  Defendants           |
|       | 18 | submitted a joinder on June 16, 2021, in ECF Number 3063.           |
|       | 19 | And plaintiffs noticed a July 12th, 2021 motion hearing              |
|       | 20 | initially for the Southern Pathway Consent Decree.                   |
| 09:06 | 21 | The Court well-understands that no hearing is                        |
|       | 22 | required by statute or regulation, and the parties do not           |
|       | 23 | and did not specifically request a hearing.                          |
| 09:07 | 24 | I wished to hold that hearing with you so I could                    |
|       | 25 | have the quick interchange of information that I may be              |

**Certified for the U.S. District Court CM/ECF**
**Debbie Gale, CSR 9472, RPR, CCRR**
**Federal Official Court Reporter**

1  lacking.  And I asked the parties to be prepared to address

2  motions to enter all three consent decrees so that after

3  decades of litigation and the number of courts that this has

4  passed through, that I'm certain I have as good an

5  understanding as I can, after 30 years of this litigation.

09:07  6       I also had a con- -- grave question what future

7  consent decrees are anticipated by the parties.

09:07  8       The response I got from the magistrate judge was

9  that the parties anticipate two further consent decrees that

10  will likely be entered in this case, although not in the

11  immediate term.  And to get to that decision-making, the

12  Court needs to move through this initial process so that you

13  can then determine what's appropriate in terms of a consent

14  decree or any disagreements.

09:08  15       And what is holding this back is the entering of

16  these threshold consent decrees that starts to move

17  remediation forward.  It's anticipated concerning soils:

09:08  18       First, that the soils operable unit of the site is

19  in an area where certain of the defendants have been held

20  libel.  It's described in Paragraph 11 of the stipulation

21  that the parties are, quote/unquote:

09:08  22            "Working collaboratively at this

23            portion of the site, but it cannot be

24            fully resolved until further remedial

25            decisions have been made."

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 16 of 97   Page ID
#:15626
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

16

09:08    1            If the parties agree to settlement in the area, it

         2    would be memorialized in a consent decree.

09:08    3            In any event the remedy itself could not be

         4    performed until after completion of the work outlined in the

         5    DNAPL Consent Degree, but the DNAPL lies under these soils.

         6    So, therefore, the roadblock to even discover, in a sense,

         7    any potential future problems is us moving forward at some

         8    point on these consent decrees before the Court to initiate

         9    this phase.

09:09   10            The second is the Southern Pathway remedy.

        11    Depending on the outcome of the investigation that

        12    defendants will perform pursuant to the

        13    Southern Pathway Consent Decree, "EP" may select an

        14    appropriate remedy for that portion of the site.  It's

        15    described in paragraph 10 of the stipulation; that, if EPA

        16    determines a remedy is necessary and agreement is then

        17    reached among the parties, the agreement would be

        18    memorialized in a future consent decree.

09:10   19            The Southern Pathway Consent Decree itself does

        20    not require the defendants to perform the cleanup.  However,

        21    the investigation defendants will perform under the

        22    Southern Pathway Consent Decree must be completed before a

        23    remedy can be selected.

09:10   24            I think that resolves the answer to the question

        25    that the Court had about future consent decrees.

09:10   1        Are there any other future consent decrees that

  2  are contemplated beyond what I stated?

09:10   3        Okay.  Hearing none.

09:10   4        The fourth question I asked Judge Standish to

  5  inquire of you were, if there are future consent decrees

  6  anticipated, why should the Court enter these three consent

  7  decrees now?

09:10   8        And the response that I've gotten from the parties

  9  through the magistrate judge is that the two potential

 10  consent decrees described in the response to my question are

 11  not expected to be completed before 2023.

09:11  12        However, it's important that the work required by

 13  these three lodged consent decrees before the Court

 14  constituting approximately $80 million of cleanup work be

 15  initiated now, or you could never ultimately get to the

 16  future consent decrees.  And while the cleanup of the

 17  groundwater and DNAPL is occurring now at a smaller scale

 18  through startup testing and pilot testing, retrospectively,

 19  entry of the recently lodged O&M and DNAPL Consent Decrees

 20  will allow the full remedy, which was begun in the

 21  Construction Consent Decree, to continue and is necessary to

 22  "remeet" [sic] the groundwater and protect the public.

09:11  23        Entry of the lodged Southern Pathway Consent

 24  Decree work is necessary to complete the investigation of

 25  the Southern Pathway.  EPA cannot select any remedy for the

09:12

1    Southern Pathway or negotiate any consent decree to

2    implement it until the investigation required by the

3    Southern Pathway Consent Decree is completed.

4           And the defendants stand ready to perform the work

5    of these three consent decrees as soon as the Court approves

6    these decrees.  And this work is an important benefit to the

7    public, and the parties appear and state are eager to begin

8    this work immediately.  So, therefore, once again, any

9    inertia in terms of these consent decrees, once again, takes

10   this litigation on a longer path than the three decades

11   before the Court.

09:12

12          The last question I had was what is the effect of

13   these three consent decrees -- of the order regarding

14   administrative closure on the barrels in the ocean or any

15   other issues.  You certainly are all aware of the -- what

16   I'm gonna call the "shallow shelf" and then the deep water,

17   and the unknown amount of hundreds of thousands of barrels

18   in apparently deep water that may not have the technology to

19   remediate or bring those barrels to the surface at the

20   present time.  Apparently even Scripps Institute was

21   involved in some kind of effort.

09:13

22          And I was concerned that any consent degree signed

23   by this Court or another court would preclude future

24   litigation if that becomes ripe.  In other words, when

25   Judge Real had this case in the 1990s, there was no

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 19 of 97  Page ID #:15629
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

19

           1    awareness of these "deep water" barrels.

09:14      2          So the entry of these three consent decrees and of

           3    attached stipulation order would have no effect on other

           4    portions of the site, according to the input from

           5    Judge Standish.  Entry of these three consent decrees and of

           6    the attached stipulation and order would have no effect on

           7    the barrels that are located far offshore nor on the

           8    public's ability to pursue cleanup of the contamination in

           9    the ocean.  And I'm going to want that representation on the

          10    future because long after I'm probably here [verbatim], I

          11    don't want there be a claim that anything that this Court

          12    has done concerning signing these consent decrees has any

          13    effect on liability or non-liability on this other unknown

          14    hundreds of thousands of barrels in the ocean.

09:15     15          So the effect of the Court's entry of these three

          16    consent decrees would be to ensure that the specified

          17    cleanup work at the areas of the site are performed and

          18    associated costs paid, and to resolve certain claims

          19    relating to those portions of the site.  The stipulation and

          20    order themselves are case management tools and have no

          21    effect other than to remove the case from initially the

          22    active docket.

09:15     23          And I've been rethinking that.  I may keep the

          24    case open and not remove it, in an administrative sense.

          25    Although it makes no sense; it just removes a number.  And I

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

20

1    may simply keep the case active and not put it on an "active

2    status" because it gives me a better monitoring, if you

3    will, ability.

09:16    4         The parties have stated, quote:

09:16    5              "This order shall have no legal

6              consequence other than to remove this

7              case from the Court's active docket and

8              to effectuate the final judgments

9              described in Paragraph 3."

09:16    10        The parties entered into a previous consent decree

11   in 2001.  That is the Offshore Consent Decree at ECF

12   Number 2645.  It's Paragraph 6.A of the stipulation that

13   addresses certain ocean issues.  This is a Cashout Consent

14   Decree for which the Court entered final judgment 20 years

15   ago.

09:16    16        Nothing that the parties apparently are asking the

17   Court to do at this time would foreclose any governmental or

18   private parties' future decisions or action regarding the

19   barrels in the ocean issue.  That's one of the reasons

20   you're here today.  I want that representation, once again,

21   and stipulation on the record.

09:16    22        Concerning the defendants' additional statements

23   to the Court, and that is, that the barrel disposal sites

24   that have been subject to recent news attention were

25   apparently documented in detail in a 1985 report prepared on

1   behalf of the Los Angeles Regional Water Control Board,

2   2000, Trial Exhibit Number 4135, *Allan Shartrand, et al.*,

3   Quote:

09:17   4            "Ocean dumping under Los Angeles

5            Regional Water Quality Control Board

6            permits a review of past practices

7            potential adverse impacts and the

8            recommendation for future action."

09:17   9            It's a March 1985 report.

09:17   10           When plaintiffs filed the operative complaint in

11   the instant lawsuit, plaintiffs alleged that Montrose, at

12   least during the period from 1947 until 1961, arranged for

13   the disposal through ocean dumping of processed waste

14   containing hazardous substances, including DDT from the

15   Montrose DDT plant.

09:18   16           The disposals of the waste material occurred at

17   and en route to ocean dump sites located in and around the

18   San Pedro Channel and the environs of the Santa Catalina

19   Island and the Channel Islands.  That's in the Third Amended

20   Complaint at paragraph 17 of December 8th, 1999.

09:18   21           Under the 2001 Offshore Consent Degree, defendants

22   made $73 million to, quote, "finally and fully resolve all

23   present and future liability," end of quote, for natural

24   resource damages and response costs in the offshore areas,

25   subject to the consent decree's reservations and reopeners.

1     The Offshore Consent Decree, Paragraphs J-7 and 11.  The

2     offshore areas include, quote:

09:19  3             "The areas in and around Santa Catalina

4             and the other Channel Islands, the

5             San Pedro Channel, and any ocean dump

6             sites used for disposing of waste from

7             the Montrose plant property and any

8             offshore areas to which hazardous

9             substances, including, without

10            limitation, DDT, aerially or otherwise

11            originating from the Montrose plant

12            property or the Stauffer Dominguez plant

13            property have or may become located."

14            That's paragraph of 5H.

09:19  15            Combined with the settlements that plaintiffs

16    reached with municipalities and parties associated with PCP

17    discharges, plaintiff collected more than $140 million to

18    address offshore contamination as set forth in ECF numbers

19    1671, 1673, and 1674.

09:20  20            I want you to correct that record, or any of the

21    exhibits that I've stated, in case I misread in this summary

22    over the last three decades trying to understand the

23    litigation in the matter.

09:20  24            So let me turn to the plaintiffs.  And you've

25    already corrected me.  I said Q&M -- my apology -- if I said

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

23

|  |  |  |
|---|---|---|
|  | 1 | "Q," it's obviously O&M, operation and maintenance. |
| 09:20 | 2 | Any corrections that you'd like to make to exhibit |
|  | 3 | numbers or the initial statement by the Court?  And then |
|  | 4 | we're going to go through each of the responses. |
| 09:20 | 5 | MS. GITIN:  Thank you, Your Honor. |
| 09:20 | 6 | **RESPONSE BY MS. GITIN** |
| 09:20 | 7 | MS. GITIN:  I had a couple of small corrections. |
|  | 8 | One was the lodging date for the Southern Pathway Consent |
|  | 9 | Decree.  And that consent decree, as stated by the Court, is |
|  | 10 | 3054.  The lodging date for that was March 12th, 2021. |
| 09:20 | 11 | I'm also not certain -- I may have misheard or |
|  | 12 | there may've been a misquote -- the amount of response costs |
|  | 13 | to be paid to the United States under the second consent |
|  | 14 | degree -- |
| 09:21 | 15 | THE COURT:  Is that the DNAPL? |
| 09:21 | 16 | MS. GITIN:  Correct. |
| 09:21 | 17 | THE COURT:  Okay. |
| 09:21 | 18 | MS. GITIN:  -- is $340,000. |
| 09:21 | 19 | That may or may not have been what Your Honor |
|  | 20 | said. |
| 09:21 | 21 | THE COURT:  It should be $340,000 to the |
|  | 22 | United States and $61,798.11 to DTSC; is that correct? |
| 09:21 | 23 | MS. GITIN:  Yes. |
| 09:21 | 24 | THE COURT:  Okay. |
| 09:21 | 25 | MS. GITIN:  And then for the third consent decree, |

```
 1   the Southern Pathway -- again, I may just not have caught it
 2   quickly enough -- but it's $3,750,000 to the United States.
 3             THE COURT:  And $250,000 to DTSC --
 4             MS. GITIN:  Correct.
 5             THE COURT:  -- for past costs primarily related to
 6   this portion of the site.
 7             MS. GITIN:  And -- and there's one other -- maybe
 8   more of a nuance.
 9             On the two consent decrees that we anticipate in
10   the future, one is the Soils Consent Decree and the other
11   the potential Cleanup Consent Decree for the
12   Southern Pathway -- um, for the first, one the Soils Consent
13   Degree, we could reach that consent decree even if these
14   three were not entered, but the work couldn't actually be
15   performed unless the second consent decree, the DNAPL -- or
16   D-N-A-P-L, is entered.
17             THE COURT:  So we need both to move forward --
18             MS. GITIN:  Yes.
19             THE COURT:  -- in a practical sense.
20             MS. GITIN:  And I do want to say on the record
21   that there is nothing in the entry of these three consent
22   decrees that can have preclusive effects on the public's
23   rights, the Court's rights, the government's rights, the
24   defendants' rights, for any other area of the site, or for
25   ocean offshore areas.
```

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

25

| | | |
|---|---|---|
| 09:22 | 1 | THE COURT: Okay. Let me turn to Montrose. |
| 09:22 | 2 | Counsel, I know each of you, as well. Would you |
| | 3 | be kind enough to just state who the speaker is for the |
| | 4 | record. |
| 09:22 | 5 | MR. RICHARDSON: Yes, Your Honor. Thank you. |
| | 6 | Kelly Richardson with Latham & Watkins for Montrose |
| | 7 | Chemical. |
| 09:23 | 8 | **RESPONSE BY MR. RICHARDSON** |
| 09:23 | 9 | MR. RICHARDSON: First, thank you for the |
| | 10 | summarization. I think you -- you summarized 30 years of |
| | 11 | litigation, uh, very accurately. I have no, uh, |
| | 12 | modifications to the statements that you made. |
| 09:23 | 13 | And I would agree with Ms. Gitin that nothing |
| | 14 | associated with the three consent decrees that are before |
| | 15 | the Court today affect anything related to the offshore |
| | 16 | issues that are addressed in -- in the -- |
| 09:23 | 17 | *(Court reporter requests clarification for the* |
| | 18 | *record.)* |
| 09:23 | 19 | MR. RICHARDSON: Yes, yeah. |
| 09:23 | 20 | There's nothing in the three consent decrees today |
| | 21 | that impact in any way the offshore issues particularly as |
| | 22 | addressed in the 2001 consent decree. |
| 09:23 | 23 | THE COURT: That was of particular concern to me: |
| | 24 | That long after you and I are counsel or court, that there |
| | 25 | would be a future argument that anything that we're doing in |

```
 1    terms of this 30 years of litigation on the Montrose sites,
 2    the Southern Pathway, et cetera, has a relationship to the
 3    deep oil barrels that have been unable, at least, to be
 4    raised at this time, apparently numbering in hundreds of
 5    thousands.  And that has to be left for future litigation or
 6    decrees.
 7          As long as I had that representation, I feel much
 8    more comfortable.  I just didn't want a future court to be
 9    looking back without clarity.  Okay?
10          MS. GITIN:  And, Your Honor, if I may?
11          I just wanna make clear the government is not
12    either endorsing or rejecting any of the statements that
13    were made in recent press articles about numbers or
14    locations of barrels.
15          THE COURT:  I -- I understand.  Okay.
16          Okay.  Well, let me turn, then, to the other
17    parties.
18          Counsel, if you'd like to state the party you
19    represent and correct the record for me, in case the Court,
20    reading these through decades of materials, has misstated an
21    Exhibit Number or mischaracterized in any way the -- you
22    know, a general outline of where we stand at the present
23    time.
24          MR. HSIAO:  This is Winston Hsiao for TFCF
25    America, Inc.
```

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 27 of 97  Page ID
#:15637
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

27

09:24   1           I've nothing further to add, Your Honor.

09:24   2           MR. DONALD:  Wiley Donald for Stauffer Management

        3   Company and Bayer CropScience.

09:25   4           No comments on your able summation.

09:25   5           THE COURT:  Okay.

09:25   6           MR. DONALD:  Thank you, Your Honor.

09:25   7           THE COURT:  Well, I appreciate it.

09:25   8           **FURTHER REMARKS BY THE COURT**

09:25   9           THE COURT:  Then can we go through Docket

        10  Number 3055.  It would be in support of the motion to enter

        11  the proposed consent decrees.  It would be the O&M and what

        12  we refer to as the DNAPL, or D-N-A-P-L, for a moment.

09:25   13          First, the estimated amount of 77 million-point or

        14  $77.6 million at the Montrose site, which contains the

        15  property where one of the largest DDT manufacturing plants

        16  in the United States operated.  These proposed consent

        17  decrees also cover over 4 million for EPA and $200,000 for

        18  DTSC toward public agency response costs.

09:26   19          The settling defendants will perform these

        20  cleanups until they're completed regardless of cost and

        21  duration at settling defendants' own expense, and will also

        22  pay the United States and DTSC's costs for overseeing the

        23  cleanups.

09:26   24          I'm requested, in this -- in these consent

        25  decrees, to find that there [sic] are substantively and

1    procedurally fair and reasonable and consistent with

2    CERCLA's purposes of having the potentially responsive [sic]

3    parties perform and fund cleanup -- preferably through

4    settlement.  Plaintiffs conclusion on behalf of -- I'm going

5    to refer to as "the government," generally -- is that these

6    are fair and consistent with CERCLA and includes

7    consideration of the comments received.

09:27    8        And we took the added precaution of sending out an

9    email -- is that correct, Karlen? -- to Del Amo.

09:27   10        THE CLERK:  Yes.

09:27   11        THE COURT:  Okay.  And also I think the Water --

12    but they should be aware of this, obviously.

09:27   13        In December 1999, plaintiffs entered the Third

14    Amended Complaint under Section 107 of CERCLA.  And in 2012

15    the plaintiffs and settling defendants Montrose, Bayer,

16    Stauffer, and TFCF entered an additional consent decree,

17    which is known as the Construction Consent Decree, which is

18    ECF Number 2731-2, which is the precursor to the presently

19    proposed O&M Consent Degree.

09:28   20        And in the Construction Consent Degree those

21    settling defendants agreed to construct the primary

22    treatment system for the cleanup of the chlorobenzene plume

23    groundwater contamination at the dual site "OU," the same

24    remedial component for which you are now committing in the

25    proposed O&M Consent Decree to perform long-term operation

| | | |
|---|---|---|
| | 1 | and maintenance. |
| 09:28 | 2 | And in just a moment, in the responses to some of |
| | 3 | the issues, I'm going to come back to this. |
| 09:28 | 4 | Apparently, the plant operated from 1947 until |
| | 5 | 1982 at the Normandie Avenue address or location.  And |
| | 6 | Montrose was apparently the biggest manufacturer of |
| | 7 | DTT [sic] in the United States.  It's set forth in your |
| | 8 | documentation that in 1962 the production at the Montrose |
| | 9 | plant reached 5.5 to 6 million pounds of "DTT" a month.  And |
| | 10 | after "DTT" was band in the United States in 1972, Montrose |
| | 11 | continued to produce "DTT" for export until 1982. |
| 09:29 | 12 | *(Court reporter requests clarification for the* |
| | 13 | *record.)* |
| 09:29 | 14 | THE COURT:  I'm sorry, Deb. |
| 09:29 | 15 | D-D-T.  So Delta, Delta, Tom. |
| 09:29 | 16 | The plant subsequently dismantled or removed from |
| | 17 | the property, and the majority of the property was paved |
| | 18 | over, which has caused a concern, obviously. |
| 09:29 | 19 | Settling Defendant Montrose was the operator of |
| | 20 | the Montrose plant at the time of the disposal of the DDT |
| | 21 | and chlorobenzene. |
| 09:30 | 22 | Suddenly, Defendant Stauffer was the operator of |
| | 23 | the Montrose plant at the time of disposal of the DDT and |
| | 24 | chlorobenzene -- my apologies.  Settling defendants -- you |
| | 25 | were the successor company in this matter; correct? |

09:30    1            MR. DONALD:  Bayer CropScience is a successor to

         2    Stauffer Chemical Company.

09:30    3            THE COURT:  Okay.  Bayer is the successor to the

         4    former owner?

09:30    5            MR. DONALD:  Yes.

09:30    6            THE COURT:  Okay.

09:30    7            -- of the Stauffer property.

09:30    8            And Settling Defendant TFCF is successor to a

         9    parent company of Montrose, which the plaintiffs have

        10    contended is directly liable as the former operator of the

        11    site; is that correct?

09:30   12            MR. HSIAO:  Correct.

09:30   13            THE COURT:  Okay.

09:30   14            Because there's been a lot of changes in the

        15    successor to these original entities.

09:31   16            All four defendants are signatories to both the

        17    O&M Consent Decree and the DNAPL "CD."

09:31   18            (To court reporter:)  And, Deb, when I say

        19    "DNAPL," it's D-N-A-P-L.  But it's commonly referred to as

        20    "D-NAPL."

09:31   21            One factor complicating the cleanup of the

        22    Montrose groundwater has been what EPA has determined to be

        23    co-mingling of the Montrose-related groundwater

        24    contamination with the groundwater contamination from the

        25    adjacent superfund site, which we've oftentimes referred to

31

|  |  |
|---|---|
| | 1 | as "dual" -- and that's the Del Amo superfund site, which is |
| | 2 | why you're getting comments, of course, from the Del Amo |
| | 3 | Action Committee, as well as contamination from additional |
| | 4 | facilities in the immediately surrounding area. |
| 09:32 | 5 | This dual OU groundwater contamination consists of |
| | 6 | three principal plumes, as the Court understands it. |
| 09:32 | 7 | First of all, the chlorobenzene plume, the benzene |
| | 8 | plume, and the TCE plume. |
| 09:32 | 9 | (To court reporter:) So, Deb, for you |
| | 10 | chlorobenzene, C-H-L-O-R-O-B-E-N-Z-E-N-E, and then plume, |
| | 11 | P-L-U-M-E. |
| 09:32 | 12 | A separate plume, the benzene plume, which we're |
| | 13 | going to discuss in just a moment. |
| 09:32 | 14 | (To court reporter:) B-E-N-Z-E-N-E. |
| 09:32 | 15 | And the third plume, the TCE -- |
| 09:32 | 16 | (To court reporter:) So Tom, Cat, Echo. |
| 09:32 | 17 | -- TCE plume. |
| 09:32 | 18 | The chlorobenzene plume contains groundwater |
| | 19 | contamination that EPA has determined came from the Montrose |
| | 20 | site. |
| 09:33 | 21 | The dual site ROD outlines cleanup standards for |
| | 22 | these three plumes. And eventually we're going to get into |
| | 23 | a discussion on the response concerning the request of |
| | 24 | 25 mg/L and 3 mg/L, that Del Amo raised in terms of |
| | 25 | reinjection of water, and their request that it move to a |

1    standard of 3 mg/L, which is why I'm setting the basis right

2    now, to see if I can get responses to all of these answers,

3    which I think I have in the documents and I think are

4    satisfactory, but I want to make certain.

09:33    5    The Court's approval of the Construction

6    of the [sic] Consent Decree in 2012 affirms EPA's decision

7    to address these three plumes separately --

09:34    8    So apparently Judge Real entered that order --

09:34    9    MS. GITIN:  Correct.

09:34    10    THE COURT:  -- in 2012.  We're bound by it.

09:34    11    -- and to construct the treatment for the

12    chlorobenzene plume.

09:34    13    So later we're going to hear a concern and a

14    response.  What's happening with these other two plumes?

15    And the response from the EPA will be that that's not part

16    of this negotiated settlement.

09:34    17    So laying the groundwork, and now moving to the

18    DNAPL, this addresses contamination that is present at the

19    site primarily in soils and shallow groundwater beneath the

20    former footprint of the former Montrose plant.  If not

21    cleaned up, DNAPL is a continuous source of contamination to

22    the groundwater.

09:34    23    The settling defendants have already conducted a

24    successful pilot test of electrical --

09:34    25    *(Court reporter requests clarification for the*

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 33 of 97  Page ID
#:15643
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

33

1      *record.)*

09:35    2           THE COURT:  Yeah, that's a mouthful.

09:35    3           Well, the settling defendants conducted a

4      successful test pilot of electrical resistance heating

5      technology.  And as of November 2020, it's represented to

6      the Court that the "pilot" had removed 8,623 gallons of

7      DNAPL or over 80,000 pounds of contamination.

09:35    8           There are terms in the two consent decrees, but

9      the key terms of the O&M Consent Decrees are as follows,

10      amongst many:

09:36   11           First, the O&M Consent Decree commits settling

12      defendants to perform operation and maintenance of the

13      chlorobenzene plume remedy at the dual site OU.  The present

14      net value of the work is estimated at $52,600,000.  But the

15      settling defendants have committed to perform the work

16      regardless of its cost, which may be in excess of the

17      settling amount, and will continue to implement the remedy

18      under the ROD's performance standards being achieved.

09:36   19           Also, the O&M CD allows recovery of $4 million and

20      previously unreimbursed EPA past response costs, and

21      $177,265.36 of previously unreimbursed DTSC past response

22      costs related to the dual site.  The settling defendants

23      will also pay the costs of EPA and DTSC oversight of the

24      work.

09:37   25           The key terms of the DNAPL Consent Decree are the

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 34 of 97  Page ID
#:15644
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

34

1    DNAPL Consent Decree commits the settling defendants to

2    operate and maintain the electrical resistence, heating and

3    soil vapor extraction remedy selected by EPA of the DNAPL

4    ROD, R-O-D.

09:37    5        The present net value of the work is estimated to

6    be at $25 million.  But the settling defendants, once again,

7    have committed to perform the work regardless of its cost,

8    and will continue to implement the remedy until the ROD's

9    performance standards are achieved.

09:38    10        The DNAPL Consent Decree also recovers $340,000 in

11    previously unreimbursed EPA past cost responses and

12    $61,798.11 in unreimbursed DTSC past response costs related

13    to the DNAPL OU.  The settling defendants will also pay to

14    the United States and DTSC's costs of overseeing settling

15    defendants' performance of the work.  And the only matters

16    addressed by this Consent Decree are the work performed, the

17    specified past response costs, and the future oversights

18    cost.  The settling defendants received no covenants not to

19    sue from the plaintiffs, only for those specified matters

20    and subject to various reservations of rights.  And, as

21    CERCLA provides, the settling defendants also receive

22    statutory contribution protection from the claims by other

23    parties regarding these matters addressed.  Settling

24    defendants do not receive a covenant not to sue or

25    contribution protection by any other OU at the site.

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 35 of 97  Page ID #:15645
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

35

09:39   1          Both consent decrees seem to generally track the

        2   standard language from the EPA's published model consent

        3   decree:  For instance, financial assurance to guarantee

        4   performance; stipulated penalties for violation.

09:39   5          Concerning the legal standards -- and as we get

        6   into the concerns that've been raised -- the standard for

        7   approval of a CERCLA federal settlement is whether it is

        8   reasonable, fair, and consistent with the purpose that

        9   CERCLA is intended to serve, as the Ninth Circuit has held

       10   in the very case *United States v. Montrose Chemical,* at

       11   50 F.3d 741, at 743, Ninth Circuit (1995) -- that's how old

       12   this litigation is.

09:40  13          Courts defer to agencies' expertise when reviewing

       14   a proposed settlement.  That deference is strengthened and

       15   set forth in *Cannons I*, 720 F.Supp. 135 [sic], and at

       16   *Randolph*, 736 F.2d at 529.  And that deference is

       17   strengthened when a government agency charged with

       18   protecting the public interest has pulled the laboring oar

       19   in constructing the proposed settlement, as the Justice

       20   Department, EPA, and DTSC have done here.

09:40  21          The district Court reviewing the proposed consent

       22   decree must refrain from second-guessing the executive

       23   branch.  The balance of competing interests "reflects" on a

       24   proposed settlement must be left in the first instance to

       25   the discretion of the Attorney General.  A consent decree is

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 36 of 97  Page ID
#:15646
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

36

09:41

09:41

09:42

1    essentially a settlement agreement subject to continued

2    judicial policing.  It is not a decision on the merits, but

3    is a product of negotiation and compromise.  And finally,

4    fairness entails both procedural and substantive fairness in

5    this matter.

6            So first, are the consent decrees substantively

7    fair?  The paramount aspect of fairness is fairness to the

8    public.  That is the ultimate goal.

9            And settling defendants must perform here all

10   relevant work, operation and maintenance of the

11   chlorobenzene plume remedy in the O&M CD, and the

12   performance of the DNAPL remedy in the DNAPL CD.  The

13   estimated amount of this work, $77.6 million.  But, once

14   again, the settling defendants are making an opened-ended

15   commitment to complete the work regardless of its cost.  The

16   settling defendants are also paying past response costs to

17   EPA and DTSC.

18           The consent decrees also must be procedurally

19   fair.  And I'm going to ask you in a few moments about the

20   past Special Master holding that EPA and DTSC were to not be

21   in communication with what I understand to be Del Amo.  And

22   we're going to get a record of when that order was lifted.

23   And eventually I'm going to ask you and make certain that

24   there's been transparency and what has occurred in that

25   interim period of time on both EPA's part, or Montrose's

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 37 of 97  Page ID #:15647
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

37

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | part, or anybody's part so that everybody's aware of the             |
|       | 2  | proceeding and had a chance to participate.                          |
| 09:43 | 3  | Litigation spanned three decades with over 3,000                     |
|       | 4  | docket entries and the person -- and the parties have not            |
|       | 5  | been sufficiently adverse.  Negotiations between the O&M CD          |
|       | 6  | and DNAPL CD were lengthy, and the parties are both                  |
|       | 7  | represented by experienced counsel and technical staff.             |
| 09:43 | 8  | Were any of you involved in the initial filing in                    |
|       | 9  | this matter in the 1990s?                                            |
| 09:43 | 10 | MR. ALLEN:  I was, Your Honor.  Jose Allen.                           |
| 09:43 | 11 | THE COURT:  Pleasure.  It's nice to have you here.                   |
| 09:43 | 12 | MR. ALLEN:  Thank you, Your Honor.                                   |
| 09:43 | 13 | THE COURT:  Especially after three decades.                          |
| 09:43 | 14 | Beyond the procedural fairness of the consent                        |
|       | 15 | decrees themselves, the EPA also must respond to public             |
|       | 16 | comment in both the dual site and the DNAPL records of              |
|       | 17 | decision, and also incorporated community comment at various        |
|       | 18 | points in its management of the site.                               |
| 09:44 | 19 | And the reason I'm asking that is there was a                        |
|       | 20 | recent complaint or a complaint concerning whether Del Amo          |
|       | 21 | had been sufficiently contacted.  And I've received a               |
|       | 22 | response, but we'll make a record of that.                          |
| 09:44 | 23 | The next prong is are these consent decrees                         |
|       | 24 | reasonable.  And under the proposed consent decree, settling         |
|       | 25 | defendants will perform and pay for the cleanups that EPA            |

|     |     |                                                              |
|-----|-----|--------------------------------------------------------------|
|     | 1   | has selected for the chlorobenzene plume and for the DNAPL   |
|     | 2   | OU.  And that's why, in a few moments, we'll discuss in a    |
|     | 3   | few moments the issues concerning benzene and the other      |
|     | 4   | plume.                                                        |
| 09:44 | 5 | And, once again, settling defendants have           |
|     | 6   | committed to fully perform and pay these cleanups, if        |
|     | 7   | appropriate, given the litigation posture of these sites.    |
| 09:44 | 8 | And finally, are these --                           |
| 09:44 | 9 | *(Court reporter requests clarification for the*   |
|     | 10  | *record) --*                                                 |
| 09:44 | 11 | THE COURT:  These portions -- and finally, are the |
|     | 12  | consent decrees consistent with CERCLA.                      |
| 09:45 | 13 | CERCLA reflects Congress' conclusion that those    |
|     | 14  | who cause pollution, not the taxpayers, should shoulder the  |
|     | 15  | cost of cleanup for superfund sites.  The statute explicitly |
|     | 16  | favors settlement, especially where PRPs agree to perform    |
|     | 17  | the work --                                                  |
| 09:45 | 18 | (To court reporter:)  Paul, Ralph, Paul -- PRPs.   |
| 09:45 | 19 | -- and directs EPA to provide incentives for       |
|     | 20  | parties to settle.                                           |
| 09:45 | 21 | It's presented to the Court that both decrees are  |
|     | 22  | fully consistent with a threefold purpose of CERCLA:         |
| 09:45 | 23 | First, to remedy the effect of hazardous           |
|     | 24  | substances to the environment;                               |
| 09:45 | 25 | Second, to ensure that the costs of those actions  |

1    are borne, to the extent possible, by those who caused the

2    releases and profited from them, and to --

09:46  3         Third, to encourage settlement of the CERCLA

4    claims.

09:46  5         It's represented to the Court and argued that both

6    decrees are consistent with published EPA CERCLA model

7    provisions; that these decrees preserve the plaintiffs'

8    rights against settling defendants to sue under CERCLA for

9    any matters other than the work and costs specifically

10   addressed in the O&M CD and the DNAPL CD, including the OUs

11   at the site.  And the decrees also provide for settling

12   defendants to conduct studies, if requested, in support of

13   EPA's five-year reviews to verify the remedies' continuing

14   protectiveness.  And it's my understanding that those have

15   already been underway.

09:46  16        Two comments -- not one -- and thank you, Counsel.

17   Two comments were received on the O&M CD submitted by

18   Del Amo Action Committee and the Water Replenishment

19   District of Southern California.  These do not directly

20   address the question of the entry of the O&M CD today.  What

21   they apparently do is raise substantive issues concerning

22   the cleanup decisions that EPA made regarding the

23   chlorobenzene plume.  So let's take those in order.

09:47  24        The first comment is that one complexity presented

25   in cleaning up the dual site OU groundwater is the need to

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 40 of 97   Page ID
#:15650
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

40

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | take into account a chemical known as para, P-A-R-A,               |
|       | 2  | chlorobenzene, C-H-L-O-R-O-B-E-N-Z-E-N-E, sulfonic,                |
|       | 3  | S-U-L-F-O-N-I-C, acid.                                              |
| 09:48 | 4  | (To court reporter:)  We're going to refer to                      |
|       | 5  | that, then, Deb, as, quote, small "p," capital C-B-S-A.            |
| 09:48 | 6  | And this substance occurs only in connection with                  |
|       | 7  | DDT manufacturing and is present in groundwater at the dual        |
|       | 8  | site.                                                              |
| 09:48 | 9  | It's represented that this is not a CERCLA                         |
|       | 10 | hazardous material, that there are no promulgated federal or       |
|       | 11 | California health-based standards for pCBSA.  And                   |
|       | 12 | accordingly, EPA did not select a cleanup value for pCBSA as       |
|       | 13 | a performance standard for the dual site remedy.                   |
| 09:49 | 14 | This is -- the 1999 dual site ROD does not require                 |
|       | 15 | the cleanup of pCBSA in the aquifer.  However, the dual site       |
|       | 16 | ROD does set pCBSA limits relegated to reinjection of             |
|       | 17 | groundwater that's been removed from the aquifer, and pCBSA       |
|       | 18 | may only be reinjected into the aquifer at the concentration      |
|       | 19 | of 25,000 parts per billion --                                     |
| 09:49 | 20 | (To court reporter:)  So, Deb, per billion, you'll                 |
|       | 21 | oftentimes hear me say ppb, so put that in parentheses.           |
| 09:50 | 22 | -- or less.  EPA set this limit after considering                  |
|       | 23 | a state agency request that EPA adopt a non-promulgated           |
|       | 24 | criteria of 25,000 ppb for reinjection based on a                  |
|       | 25 | toxicological study.                                               |

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 41 of 97   Page ID #:15651
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

41

09:50  1              Now, let me stop.

09:50  2              There have been lot of variations between the

3    State of California and the federal government.  Federal

4    government supervises the entire United States, from

5    Oklahoma to Texas to California.  And California's been

6    perceived to be more progressive in some quarters concerning

7    the environment.

09:51  8              Apparently, in 2014, following settling

9    defendants' commencement of the construction groundwater

10   system, the Del Amo Action Committee was concerned about the

11   pCBSA and asked EPA and state agencies to re-examine the

12   pCBSA aspects of the chlorobenzene plume groundwater remedy,

13   and the agencies agreed to do so.

09:51  14             EPA took DCA's concern seriously and even directed

15   Montrose to postpone the functional testing -- that, once

16   again, has set us back -- on the groundwater remedy, and a

17   decision that caused Montrose to raise a dispute with EPA

18   under the Construction Consent Decree.

09:51  19             And as I understand it from your briefing and

20   looking at these documents, over Montrose's objection, EPA

21   conducted a formal analysis under California's

22   anti-degradation policy of the impacts of reinjecting

23   "pBSA."  And that is your 2017 analysis.  And that's

24   published -- and was published on the EPA's website.

09:52  25             And this concerned the discharge of some waste and

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 42 of 97  Page ID #:15652
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

42

| | |
|---|---|
| 1 | whether it was permissible and quality of certain bodies of |
| 2 | water by preventing degradation.  And in performance of the |
| 3 | dual site groundwater cleanup, pCBSA could potentially be |
| 4 | introduced into waters of California where it had not |
| 5 | previously been present.  And EPA concluded an analysis |
| 6 | under the policy was warranted.  And after reviewing and |
| 7 | updating this information and conferring with the |
| 8 | Los Angeles Regional Water Quality Control Board, EPA then |
| 9 | concluded that the reinjection of the treatment water, with |
| 10 | up to 25,000 ppb, and then separate "pCBSA," as specified in |
| 11 | the ROD, R-O-D, was consistent with the policy. |

09:53  12    And in this analysis, EPA determined that the
13  25,000 ppb limit for reinjection remained protective of
14  health and the environment.  And that was describing a 2015,
15  five-year review of protectiveness.

09:53  16    And when it drafted the 2017 analysis, EPA used
17  the working assumption that settling defendants would be
18  able to effectively operate the treatment system for
19  chlorobenzene plume using only the western-most two well
20  fields.

09:53  21    And later on, we're going to come to the fact that
22  the eastern-most well field apparently may be used.

09:54  23    This reinjection stream would, quote/unquote,
09:54  24     "be monitored and 'evaluate' to
25     determine if reliance on the western

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | injection well field is effective and if                 |
|       | 2  | the system will achieve the remedial                     |
|       | 3  | action objective set forth in the 1999                   |
|       | 4  | ROD."                                                     |
| 09:54 | 5  | (As Read.)                                                |
| 09:54 | 6  | So following Montrose's reassumption of this             |
|       | 7  | functional testing and its submission of the modeling, in |
|       | 8  | 2018/2019, it became clear to the parties and -- that the |
|       | 9  | settling defendants might need to use both the eastern and |
|       | 10 | western well fields -- you're stating to me -- to perform |
|       | 11 | the groundwater cleanup and comply with the dual ROD -- or |
|       | 12 | the dual site ROD.                                        |
| 09:54 | 13 | So there's an amended analysis that includes             |
|       | 14 | appropriate conditions set forth in a public-available 2019 |
|       | 15 | Memorandum to File. And it's called the Flow Rate Memo.  |
| 09:54 | 16 | (To court reporter:) So, Deb: Flow rate --               |
|       | 17 | F-L-O-W, R-A-T-E -- memo.                                 |
| 09:55 | 18 | And that clarifies the ROD. The limited use of           |
|       | 19 | the eastern well field might be necessary to perform the |
|       | 20 | cleanup, and thus in the public interest, and would be   |
|       | 21 | consistent with the policy.                              |
| 09:55 | 22 | So let me stop.                                           |
| 09:55 | 23 | Is that eastern well field being used now?               |
| 09:55 | 24 | MS. GITIN: Yes, Your Honor, but subject to the           |
|       | 25 | conditions in the Flow Rate Memo.                         |

| 09:55 | 1 | THE COURT:  Okay. |
|---|---|---|
| 09:55 | 2 | There's a secondary, independently conducted |
|  | 3 | five-year review that's concluded that the groundwater |
|  | 4 | remedy is expected to be protective of human |
|  | 5 | health/environmental (verbatim) upon completion.  And |
|  | 6 | there's no exposure to contaminated -- |
| 09:55 | 7 | *(Court reporter requests clarification for the* |
|  | 8 | *record.)* |
| 09:55 | 9 | THE COURT:  There's no exposure to contaminated |
|  | 10 | groundwater, and there's no evidence of dual site |
|  | 11 | contamination intruding into indoor air. |
| 09:56 | 12 | And the settling defendants have agreed in the |
|  | 13 | proposed O&M Consent Decree to withdraw the two disputes |
|  | 14 | they previously raised on the Construction Consent Decree |
|  | 15 | and, once again, to commit in the O&M Consent Decree to |
|  | 16 | perform the ROD consent with the Flow Rate Memo. |
| 09:56 | 17 | **COURT'S INQUIRY** |
| 09:56 | 18 | THE COURT:  So here are the comments and the very |
|  | 19 | few questions I may have: |
| 09:56 | 20 | Both commenters raised concerns about the pCBSA. |
|  | 21 | Del Amo Action Committee states: |
| 09:56 | 22 | "Reinjecting contaminated water from a |
|  | 23 | superfund site (inaudible)" -- |
| 09:56 | 24 | *(Court reporter requests clarification for the* |
|  | 25 | *record.)* |

09:56  1          THE COURT:  (Reading:)

09:56  2           "Reinjecting contaminated water from a

       3          superfund site into clean water is

       4          wrong."

09:57  5          DAAC --

09:57  6          (To court reporter:)  And I'm going to refer to

       7  them Deb as the Del Amo Action Committee on occasion.

09:57  8          -- also believes EPA should order Montrose to pay

       9  costs associated with developing a standard for pCBSA in

      10  drinking water.

09:57 11          "WRD" expresses concern about reinjecting pCBSA at

      12  the 25 mg/L or 25,000 ppb standard requested by a state

      13  agency in the dual ROD site --

09:57 14          So it appears to me we actually have a conflict

      15  going on between two state agencies.  And you can correct me

      16  in just a moment.

09:57 17          -- when the State Environ -- Office of

      18  Environmental Health Assessment proposed in 2015 a 3 mg/L --

      19  or mg, slash, L -- 3,000 ppb concentration in drinking

      20  water.

09:58 21          The response by EPA and DTSC agree that it is

      22  important to follow the policy, which EP [sic] selected as

      23  the applicable or relevant requirement and that the agencies

      24  extensively evaluated the proposed remedy under the policy,

      25  and EPA published its analysis in 2017, and then revised it

1    in 2019 to reflect new information about the performance of

2    the remedy.  And this process included several meetings with

3    DCAA [sic].

09:58    4        I'm gonna know when those meetings occurred,

5    basically where they were at, and the depth of those

6    meetings in just a moment.

09:58    7        The analysis reflects EPA's judgment, after

8    consultation with state agencies and the public, that when

9    the remedy requires extraction and treatment of pCBSA

10   containing groundwater from the aquifer, limited reinjection

11   at concentrations below 25,000 ppb into wells, where the

12   treated groundwater can be recaptured to the greatest extent

13   possible, is appropriate and protective of the human

14   environment; and that the 3 mg/L concentration mentioned by

15   the WRD is not a promulgated standard; that, in fact, there

16   is no federal or California promulgated standard for pCBSA,

17   which is not a CERCLA hazardous substance; and that further,

18   this non-promulgated concentration, represented as a

19   concern, is actually a drinking water standard, not an

20   injection standard; and pursuant to the ROD, that the

21   25,000 ppb is the maximum concentration at which pCBSA may

22   be reinjected and the modeling projects that reinjected

23   water treated at this level will not reach drinking water

24   wells for the duration of the remedy, and thus, this model

25   shows, will not introduce any "CBSA" into drinking water

|        |    |                                                               |
|--------|----|---------------------------------------------------------------|
|        | 1  | wells, let alone pCBSA above 3,000 ppb.                       |
| 10:00  | 2  | In addition, it's represented to this Court that             |
|        | 3  | EPA sampled seven nearby wells to additionally test this     |
|        | 4  | pCBSA, and all results up to this time were non-detect.      |
| 10:00  | 5  | So let me stop.  That's the first comment by                 |
|        | 6  | Del Amo.                                                      |
| 10:00  | 7  | Comments by EPA?                                             |
| 10:01  | 8  | MS. GITIN:  Certainly, Your Honor.  Thank you.              |
| 10:01  | 9  | First of all, I wanted to make sure that one --             |
|        | 10 | one answer I gave you does not require correction, which is  |
|        | 11 | about the eastern well field.                                |
| 10:01  | 12 | (To opposing counsel:) Kelly, is it accurate that           |
|        | 13 | it's being used now, or it's just projected that it will be? |
| 10:01  | 14 | MR. RICHARDSON:  It's being used only in                    |
|        | 15 | connection with testing currently.                           |
| 10:01  | 16 | THE COURT:  Okay.                                            |
| 10:01  | 17 | MS. GITIN:  Thank you.                                       |
| 10:01  | 18 | THE COURT:  Okay.  So, once again, we have the              |
|        | 19 | concern of the reinjection standard -- of which, apparently, |
|        | 20 | there is no standard -- different agencies with diff --     |
|        | 21 | promulgations.                                               |
| 10:01  | 22 | So your comments by EPA.                                     |
| 10:01  | 23 | MS. GITIN:  Certainly.                                       |
| 10:01  | 24 | **COMMENTS BY MS. GITIN**                                    |
| 10:01  | 25 | MS. GITIN:  Your Honor, the first thing I would             |

1    like to make clear is that there is no conflict between the

2    federal government and the State, or between or among state

3    agencies here.

10:01    4            And I think it's easy to, at first glance, imagine

5    that there might be because you see two numbers that are

6    different:  25,000 parts per billion and 3,000 parts per

7    billion.  But they're not apples to apples at all.

10:02    8            The 3,000 parts per billion -- which, again, is

9    not a promulgated standard; it's more of a, "Hey, you might

10   wanna be aware of this if you're a drinking water provider."

11   That is for concentration in drinking water.  So if a

12   drinking water purveyor has a drinking water well and is

13   serving that water to the public, that's where that 3,000

14   parts per billion is relevant.

10:02    15           The 25,000 parts per billion that is discussed in

16   our papers is for something completely different.  It is --

17   um, if Montrose is in the course of treating water and

18   performing this groundwater remedy for the chlorobenzene

19   plume, if they are moving around water that has pCBSA in it,

20   they may only reinject it into the aquifer at 25,000 parts

21   per billion or less.

10:03    22           Couple things I would say about that.  First of

23   all, the aquifer they're reinjecting it into is not the same

24   aquifer as the aquifer that drinking water is being drawn

25   from.

10:03   1        The aquifer they're reinjecting it into -- let me

2    make sure I get this right -- is the Gage aquifer at 175 to

3    240 feet below ground surface.

10:03   4        (To court reporter:) And Gage is G-A-G-E.

10:03   5        So that's where the treated water is reinjected.

6    That is the second shallowest of four aquifers.

10:03   7        The deepest one -- so the fourth aquifer, if

8    you're going downward, is called the Silverado.  The

9    Silverado is at 530 to 750 feet down.  And that's where

10   drinking water is drawn from.

10:03   11       The third and forth aquifers are separated by over

12   200 feet of clay, vertically.

10:04   13       In addition, drinking water wells are a couple

14   miles from where -- "laterally" from where treated water is

15   being reinjected.  So Montrose is able to reinject water

16   into the Gage aquifer at 25,000 parts per billion.

10:04   17       And that -- and so what does that translate into,

18   in terms of the drinking water wells that are a couple miles

19   down gradient and that are also pulling from an aquifer

20   several hundred feet lower down.

10:04   21       Right now we're monitoring this very carefully,

22   and Montrose is required to continue monitoring it as part

23   of its performance of the O&M Consent Decree.

10:04   24       And so what are we seeing.  There are no hits of

25   pCBSA in drinking water at all; they are non-detect.

10:05   1        So, first of all, it's not apples to apples.  The

2    25,000 is what they can reinject in one spot, and the

3    3,000 -- which, again, is not a promulgated standard -- is

4    what the drinking water purveyors might want to take note of

5    if they are serving drinking water.

10:05   6        However, we are -- as EPA and DTSC, we're very

7    concerned about making sure that nothing that happens in

8    this remedy is affecting the drinking water.  So what sorts

9    of protections do we have built in here?

10:05  10        First of all, the Flow Rate Memo that we mentioned

11   is a limit on how much this groundwater remedy can move

12   water that contains pCBSA around.  So it tries to minimize

13   that consistent with the performance of the remedy.

10:05  14        So why do they have to move it around at all?

15   Because that's what needs to happen for the cleanup to be

16   effective.

10:05  17        Second of all, currently -- um, because we have

18   the Construction CD and the Consent Decree -- sorry --

19   Construction Consent Decree and the functional testing, um,

20   we already have that system operating, though not at full

21   scale.  And right now it's reducing pCBSA to well-below

22   the -- those limits.

10:06  23        My understanding -- and Mr. Richardson can correct

24   me if I'm not correct -- is that the current --

10:06  25        *(Court reporter requests clarification for the*

```
 1        record.)
 2             THE COURT:  A little slower.
 3             MS. GITIN:  Sorry.
 4             -- from the groundwater treatment system is at
 5   about 8- or 9,000 parts per billion pCBSA.
 6             THE COURT:  Would you restate that.  In other
 7   words, is this the injection rate 8- to 9,000?
 8             MS. GITIN:  Maybe I'll let Mr. Richardson --
 9             THE COURT:  No, no.  Let me be sure.
10        Did I hear that our injection is at 8- to 9,000,
11   not even close to 25,000?
12             MR. RICHARDSON:  That's correct, Your Honor.
13             THE COURT:  So we're well below; in other words --
14             MS. GITIN:  Yes.
15             THE COURT:  Now, we're --
16             MS. GITIN:  It could go up and down.  We expect it
17   will go up and down as they're moving water.
18             THE COURT:  Let me be absolutely certain, though.
19        We have conflict between what I'm going to call
20   "pure drinking water" and a concern about reinjection; that
21   you're representing to the Court it's just not going to
22   occur because of the monitoring process; but regardless --
23   the depth, the clay, et cetera -- but regardless of the
24   25,000 standard, you're not approaching that.
25             Understood.  I understand fluctuation.  But
```

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | basically you're representing to the Court that you're about |
|       | 2  | 7-, 8-, 9,000, which is phenomenally under the 25,000, but   |
|       | 3  | it's, of course, not at the 3,000 pure drinking water level |
|       | 4  | for reinjection.                                            |
| 10:07 | 5  | That's a surprise to the Court and a very                   |
|       | 6  | positive --                                                 |
| 10:07 | 7  | MS. GITIN:  Yeah.                                           |
| 10:07 | 8  | THE COURT:  -- very positive development that I             |
|       | 9  | didn't expect.  I thought I would hear today around 25,000. |
|       | 10 | Okay.  Thank you.                                           |
| 10:07 | 11 | MS. GITIN:  And, again --                                   |
| 10:07 | 12 | THE COURT:  That's a fact, Counsel, that makes             |
|       | 13 | your flight and appearance well worth it.                   |
| 10:08 | 14 | MS. GITIN:  Thank you.  Thank you.                         |
| 10:08 | 15 | EPA's technical staff does anticipate that that            |
|       | 16 | may go up and down at various --                            |
| 10:08 | 17 | THE COURT:  I understand that.  And I                       |
|       | 18 | understand -- let me repeat for the record -- that it's not |
|       | 19 | consistent and it can vary.  But I didn't expect that.  I   |
|       | 20 | didn't expect that good news.                               |
| 10:08 | 21 | I expected that we were close to 25,000 and just,           |
|       | 22 | you know, inching along.  That is incredibly good news.     |
| 10:08 | 23 | All right.  Please continue.                                |
| 10:08 | 24 | MS. GITIN:  And, third, as we discussed before,           |
|       | 25 | this water is not getting to drinking water wells at all.   |

10:08  1          THE COURT:  Is that why you have the seven

2  monitoring wells?  Is that part of this process?

10:08  3          MS. GITIN:  (To opposing counsel:) Kelly, do you

4  wanna address?

10:08  5          MR. RICHARDSON:  Yes, that's correct, Your Honor.

6  The monitoring of those wells will continue --

10:08  7          THE COURT:  Okay.

10:08  8          MR. RICHARDSON:  -- to ensure -- I would call them

9  sentinel wells to --

10:08  10         THE COURT:  Okay.

10:08  11         MR. RICHARDSON:  -- check before there's a

12  problem.

10:08  13         THE COURT:  So I've got that guarantee also.

10:08  14         MR. RICHARDSON:  That's in the Statement of Work.

15  Yes, Your Honor.

10:08  16         THE COURT:  I've got the same issue at Saipan

17  right now.  We've got 62 wells over there.  We're going

18  through much of the same process with filters, et cetera,

19  and holding back seawater at the same time so...

10:09  20         Okay.

10:09  21         MS. GITIN:  I think -- I think that's an excellent

22  point.

10:09  23         If for some reason there were -- so our modeling

24  and Montrose's modeling 50 years out says that we do not

25  anticipate that there will be any impact to drinking water

        1   wells.  And Montrose is required to, in the Statement of

        2   Work, to update that modeling every five years to take into

        3   account new data.

10:09   4           But in a much more granular level, the monitoring

        5   wells are giving us data too of whether we start to see a

        6   problem.  It's not like whack-a-mole where it's suddenly

        7   gonna pop up in a drinking water well.  If there's any risk

        8   to drinking water wells, we will see it coming literally

        9   miles away, and have time to be able to react and respond.

10:09   10          And we meet -- uh, EPA meets with regularly with

        11  the L.A. Water Replenishment District, WRD, and other water

        12  purveyors.  And...

10:10   13          THE COURT:  All right.  Let me turn to Montrose,

        14  then, for just a moment.

10:10   15          MS. GITIN:  Certainly.

10:10   16          THE COURT:  Do you have any further comments on

        17  behalf of Montrose?

10:10   18          MR. RICHARDSON:  Your Honor, I think, it's

        19  important to look at the toxicity of pCBSA.  As the Court

        20  noted, it is not a hazardous substance under CERCLA.  And

        21  there's a reason.  And the reason is it's nontoxic.

10:10   22          So, for example, it's less toxic than the caffeine

        23  I drank this morning on the way in.  It's less toxic than

        24  vitamin D.  It's just not a toxic substances [sic] and

        25  that's why it's not regulated under -- under CERCLA.

10:10   1           One, it's nontoxic.

10:10   2           Two, EPA did a --

10:10   3        *(Court reporter requests clarification for the*

        4      *record.)*

10:10   5           MR. RICHARDSON:  EPA did a toxicity study for

        6   pCBSA for -- different site, not -- not our site -- in 1985.

        7   That study concluded that the pCBSA was nontoxic.  That led

        8   to the 1999 Record'a Decision that concluded that 35,000

        9   parts per billion was actually a safe reinjection standard.

10:11  10           In response to the State request, EPA then set the

       11   reinjection standard at that time at 25,000.  So there was

       12   already a margin'a safety built in --

10:11  13           THE COURT:  Already a margin of...?

10:11  14           MR. RICHARDSON:  Margin of safety.

10:11  15           THE COURT:  Okay.

10:11  16           MR. RICHARDSON:  Because 35,000 was deemed safe --

       17   at least 35,000 -- they set it at 25,000.

10:11  18           Fast-forward to 2014 when the Del Amo Action

       19   Committee raised its concerns about pCBSA, the very same

       20   concerns --

10:11  21           THE COURT:  Slower.  Slower.

10:11  22           MR. RICHARDSON:  -- the very same concerns that we

       23   saw in the comments they submitted in this groundwater CD

       24   that's before the Court now.

10:12  25           EPA, then, in 2015, conducted 276 toxicity tests,

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

56

```
 1   referred to as TOX-21.  It's just a specialized name for the
 2   type of test.  276 toxicity tests.  Not a single one of
 3   those tests showed any activity -- a term of art for the
 4   scientists -- showed no activity for any toxicity, no
 5   carcinogenicity, no terat -- teratogenicity.
```
10:12   6            I can spell that.  I think I can spell that.
10:12   7            THE COURT:  At the recess.
10:12   8            MR. RICHARDSON:  Okay.  At recess.
10:12   9            So an enormous number of studies done in 2015
```
10   after Del Amo Action Committee raised these concerns in
11   2014.
```
10:12   12            So, in short, it's just not a toxic substance.
10:12   13            THE COURT:  Okay.
10:13   14            Then let me turn to any of the parties, if you
```
15   wish to comment, and the name and the entity you represent.
```
10:13   16                     **COURT'S INQUIRY RE TBA**
10:13   17            THE COURT:  All right.  Then I'd like to take the
```
18   second comment.
```
10:13   19            The Del Amo Action Committee mentioned an
```
20   additional chemical, TBA, stating that it will not be
21   adequately treated before reinjection, according to the ROD.
22   And the response was that this comment does not relate to
23   the reasonableness of the O&M Consent Decree; that there's
24   no federal or state drinking water standard, once again, for
25   TBA; and that the 1999 Dual Site ROD did not provide a TBA
```

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | treatment standard.                                        |
| 10:13    | 2  | And even so, the Court -- or the past Court deemed         |
|          | 3  | the Construction CD fair, reasonable, and consistent with  |
|          | 4  | CERCLA.  And the Construction of the Consent Decree -- and |
|          | 5  | the Construction Consent Degree is not before the Court on |
|          | 6  | this motion.  And it's represented that the settling       |
|          | 7  | defendants, at EPA's request, are monitoring the           |
|          | 8  | concentration of TBA in the aquifer and "in-effulent" from |
|          | 9  | the chlorobenzene plume treatment plant and all effluent   |
|          | 10 | concentrations have been "non-detect" to date.             |
| 10:14    | 11 | Is that still a correct statement.                         |
| 10:14    | 12 | MS. GITIN:  That's my understanding, Your Honor.           |
| 10:14    | 13 | THE COURT:  Is that a correct statement?                   |
| 10:14    | 14 | MR. RICHARDSON:  My understanding as well,                 |
|          | 15 | Your Honor.                                                |
| 10:14    | 16 | THE COURT:  Okay.                                          |
| 10:14    | 17 | MS. GITIN:  And you have in the declaration --             |
| 10:14    | 18 | THE COURT:  I do.  But I'm gonna verify that now           |
|          | 19 | on the record.                                             |
| 10:14    | 20 | Before I'm concerning signing off on anything, I           |
|          | 21 | want you here, and I wanna have this transparent discussion,|
|          | 22 | and I wanna have answers as of today, not from a declaration|
|          | 23 | from somebody -- I think it's "Westmore" or whoever.       |
| 10:14    | 24 | MS. GITIN:  I will say I am not aware of any               |
|          | 25 | information to the contrary.                               |

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 58 of 97  Page ID
#:15668
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

58

10:15   1          THE COURT:  Okay.

10:15   2          **COURT'S INQUIRY RE TI WAIVER ZONE**

10:15   3          THE COURT:  The third comment concerns the "TI

        4  Waiver Zone."  We're going to call this the "Containment

        5  Zone."

10:15   6          There the Del Amo committee objected to the use of

        7  the TI Waiver Zone, calling it a "sacrifice zone," where

        8  there was no attempt to remove cancer-causing chemicals and

        9  it asked the zone be reevaluated based on current

       10  technology, and it expressed a concern about the potential

       11  exposure in people's homes who live above the

       12  TI Waiver Zone, and in drinking water.

10:15  13          So we're back to the same issue concerning

       14  drinking water about homes above the containment zone.

10:15  15          And the response is that this comment has no

       16  bearing on the reasonableness of the O&M Consent Decree.

10:15  17          The TI Waiver Zone, or containment zone, has been

       18  part of the dual site ROD since 1999 and was incorporated

       19  into the 2012 Construction Consent Decree deemed by the

       20  Court to be fair.

10:16  21          So the prior judge had deemed that to be fair.

       22  That's already a ruling by the Court.

10:16  23          And every five years, pursuant to 121(c) of

       24  CERCLA, EPA analyzes whether the ROD's standard remains

       25  protective of human health.  And you've represented to me,

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | literally, on page 23, at lines 12, the following:         |
| 10:16 | 2  | "The latest five-year review completed                     |
|       | 3  | in 2020 concludes that the remedy                          |
|       | 4  | remains protective."                                       |
| 10:16 | 5  | And you've given me Westmore's declaration.                |
| 10:16 | 6  | As of today's date, would you make the same                |
|       | 7  | statement?                                                 |
| 10:16 | 8  | MS. GITIN:  Yes, Your Honor.                               |
| 10:16 | 9  | THE COURT:  Okay.                                          |
| 10:16 | 10 | Also the containment water that will be contained          |
|       | 11 | within the waiver zone does not impact residents who live  |
|       | 12 | above it.  So the groundwater in the TI waiver zone is not a|
|       | 13 | source.                                                    |
| 10:16 | 14 | (To court reporter:) And T-I, by the way, Tom,            |
|       | 15 | India.  TI Waiver Zone.  And, Deb, I'll also refer to it as |
|       | 16 | a containment zone.  Okay?                                  |
| 10:17 | 17 | The groundwater in the TI Waiver Zone is not a             |
|       | 18 | source of drinking water.  So thus, neither the drinking    |
|       | 19 | water nor the "indoor air residents" living above the TI    |
|       | 20 | Waiver Zone would be affected if there was any of           |
|       | 21 | groundwater contamination.                                 |
| 10:17 | 22 | I don't think I require any further comment,               |
|       | 23 | unless you'd like to make it, because I think the Court's   |
|       | 24 | satisfied with that response.                              |
| 10:17 | 25 | Would anybody like to make a comment concerning           |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | that?                                                                     |
| 10:17 | 2  | MS. GITIN:  No.  Thank you.                                               |
| 10:17 | 3  | THE COURT:  All right.                                                    |
| 10:17 | 4  | **DEL AMO ACTION COMMITTEE**                                             |
| 10:17 | 5  | **QUESTIONS RE TCE AND BENZENE PLUMES**                                  |
| 10:17 | 6  | THE COURT:  Then comments regarding the TCE --                           |
| 10:17 | 7  | (To court reporter:) So Tom, Charles Echo.                               |
| 10:17 | 8  | -- TCE and benzene plumes.                                               |
| 10:17 | 9  | Del Amo has -- Action Committee asks that the                            |
|       | 10 | identification of additional responsible parties needs to be            |
|       | 11 | completed and states that these parties need to be held                 |
|       | 12 | accountable for the pollution that've [sic] caused.                     |
| 10:18 | 13 | The response has been that this has not addressed                       |
|       | 14 | the fairness or reasonableness of the O&M Consent Degree                |
|       | 15 | before the Court because the O&M Consent Decree reflects the            |
|       | 16 | decision made before entry of the Construction CD to enter              |
|       | 17 | into separate agreements with the parties responsible for               |
|       | 18 | chlorobenzene, TCE, and the benzene plumes.                             |
| 10:18 | 19 | And my understanding is the former Court separated                      |
|       | 20 | those plumes out.  Is that correct?                                      |
| 10:18 | 21 | MS. GITIN:  Correct, Your Honor.                                         |
| 10:18 | 22 | THE COURT:  Okay.                                                         |
| 10:18 | 23 | So WRD is incorrect, you've stated, in stating                          |
|       | 24 | that the main constituents of issue and the O&M Consent                 |
|       | 25 | Decree are benzene and TCE.                                              |

10:18   1        That's not a correct statement.  And from the

2  record, it seems to be validated that that is not a correct

3  statement.  Rather the O&M --

10:18   4        *(Court reporter requests clarification for the*

5     *record.)*

10:18   6        THE COURT:  The O&M Consent Decree, like the

7  Construction Consent Decree, is specifically limited to the

8  chlorobenzene plume, including the commingled contamination.

10:19   9        And I'm taking that from the other superfund site

10  as well, dual.  Is that correct?

10:19  11        MR. RICHARDSON:  Correct.

10:19  12        THE COURT:  Correct?  Yes or no.

10:19  13        MR. RICHARDSON:  That is correct.

10:19  14        THE COURT:  Okay.  And does not address the TCE

15  and the benzene plumes or affects plaintiffs' rights to

16  pursue responsible parties concerning those plumes.

10:19  17        So by my signing this, we move forward, as I

18  understand it, and finally start a breaking of the inertia,

19  finally start remediation; and EPA is still free to sue

20  responsible parties for the DNAPL and the TCE plume; is that

21  correct?

10:19  22        MS. GITIN:  That's correct, Your Honor.

10:19  23        THE COURT:  Then I cannot understand why I would

24  not be proceeding forward, based upon this response by

25  Del Amo.

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 62 of 97   Page ID #:15672
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

62

10:20   1          Now, all parties agree and plaintiff, the

2    government, agrees that the PRB's for the TCE plume and

3    benzene plume should be held responsible.  However, those

4    entities are not defendants in the civil action.

10:20   5          Probably not my concern.

10:20   6          Do we know who those entities are?

10:20   7          MS. GITIN:  Yes, we do, Your Honor.

10:20   8          THE COURT:  Are they being pursued?

10:20   9          MS. GITIN:  Yes.  We're in particular

10   conversation --

10:20  11          THE COURT:  -- not part of our action with

12   Montrose and the other defendants before us?

10:20  13          MS. GITIN:  That's correct, Your Honor.

10:20  14          THE COURT:  So if Del Amo was here, we would be

15   able to respond they are being pursued; they're just not

16   part of this consent decree.

10:20  17          And if we hold up, waiting for that, we're never

18   going to get remedial action in this matter.

10:20  19          All right.  I'm going to pass on to Number 3.

10:20  20          This is baffling to me.

10:20  21          Many of the issues involved in the five-year

22   reviews are concerning community involvement.  And EPA

23   recognizes the importance of community involvement.  You've

24   got a public record; you followed the process and procedure.

25   And, of course, you value the input of Del Amo and other

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 63 of 97   Page ID #:15673
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

63

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | public members.                                                  |
| 10:21 | 2  | But you've stated DAAC has been involved as a                    |
|       | 3  | stakeholder in the site since 1993.  You've stated EPA hosts     |
|       | 4  | periodic public meetings to inform the public of                 |
|       | 5  | site-related news.                                               |
| 10:21 | 6  | But, later on, I note that the Special Master with               |
|       | 7  | the prior Court was prohibited "in" having communication         |
|       | 8  | between EPA, DTS, and Del Amo.  And so I need your help.          |
| 10:22 | 9  | What happened?  Was that John Carroll as the                     |
|       | 10 | Special Master?                                                   |
| 10:22 | 11 | MS. GITIN:  That's correct, Your Honor.                          |
| 10:22 | 12 | THE COURT:  All right.                                           |
| 10:22 | 13 | Was a reason given to you for that                               |
|       | 14 | noncommunication?  In other words, was it vitriolic?  Did        |
|       | 15 | you have any input about why that communication was deterred     |
|       | 16 | by the Special Master?                                           |
| 10:22 | 17 | MS. GITIN:  So, Your Honor, obviously -- the                     |
|       | 18 | generally, the parities wouldn't be reporting on                 |
|       | 19 | confidential settlement communications to the --                 |
| 10:22 | 20 | THE COURT:  I see.                                               |
| 10:22 | 21 | MS. GITIN:  -- the public.                                       |
| 10:22 | 22 | However, the government's position was that the                  |
|       | 23 | Special Master's order was well-overbroad and did inhibit        |
|       | 24 | the public's right to talk to public officials, and so we        |
|       | 25 | opposed that order and --                                        |

| | | |
|---|---|---|
| 10:22 | 1 | THE COURT:  You overruled it. |
| 10:22 | 2 | MS. GITIN:  -- the Special Master did in fact -- |
| | 3 | uh, my understanding is he may've stayed, rather than |
| | 4 | formally lifted that order. |
| 10:22 | 5 | THE COURT:  All right. |
| 10:22 | 6 | Now, how long was that order in effect?  In other |
| | 7 | words, if that order was in effect until -- 2016 to 2021, |
| | 8 | earlier, I'm concerned at least that Del Amo has -- |
| | 9 | certainly they know -- are aware of these proceedings. |
| 10:23 | 10 | When was that order lifted? |
| 10:23 | 11 | MR. RICHARDSON:  Your Honor, I think that order |
| | 12 | was only active for one to two months in 2018. |
| 10:23 | 13 | THE COURT:  My impression was it was actually |
| | 14 | 2017.  I don't know.  Why don't you check your records. |
| | 15 | You're the litigants in this matter. |
| 10:23 | 16 | MS. GITIN:  I have from Ms. Hey -- and we can |
| | 17 | really run this to ground, if you like.  We could take a |
| | 18 | brief recess to do that.  But it looks to us that the order |
| | 19 | was issued on December 12, 2018, and then was stayed about |
| | 20 | two months later, February 27, 2019. |
| 10:23 | 21 | THE COURT:  All right.  That sets my concerns |
| | 22 | aside. |
| 10:23 | 23 | I wanted a clear record that whatever this order |
| | 24 | was, in terms of noncommunication, was relatively brief, for |
| | 25 | a couple-month period of time, and we don't have a lack of |

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | transparency or a lack of input.  And the representation is,           |
|       | 2  | and I think it bears out -- our belief was it was for a                |
|       | 3  | very, very short period of time.  And it must've been                  |
|       | 4  | because of settlement negotiations or information that might           |
|       | 5  | flow, out that was confidential, to all the parties.  But              |
|       | 6  | I'm speculating.                                                       |
| 10:24 | 7  | **COURT'S TENTATIVE FINDINGS**                                          |
| 10:24 | 8  | THE COURT:  Well, then I'm initially or                                |
|       | 9  | tentatively prepared to find that the consent decrees that             |
|       | 10 | secure nearly $80 million worth of groundwater and DNAPL               |
|       | 11 | cleanup work will effectively remediate hazardous                      |
|       | 12 | substances, protect the health of the community and the                |
|       | 13 | environment, and put the responsibility for cleanup with the           |
|       | 14 | parties responsible for contamination; and that these                  |
|       | 15 | decrees do reflect significant coordination and technical              |
|       | 16 | evaluation amongst the agencies as well as careful                     |
|       | 17 | consideration of the public interests and of public                    |
|       | 18 | comments.                                                              |
| 10:24 | 19 | And then, for those reasons, after we discuss                          |
|       | 20 | other pathways, unless there's further comment, I'm                    |
|       | 21 | tentatively going to approve these orders today for OM --              |
|       | 22 | O&M and DNAPL.                                                          |
| 10:25 | 23 | I'm going to turn this back to EPA for any further                     |
|       | 24 | comments, if you wish, before I move on to the Southern                |
|       | 25 | Pathways after a brief recess.                                         |

| | | |
|---|---|---|
| 10:25 | 1 | **COMMENTS BY MS. GITIN** |
| 10:25 | 2 | MS. GITIN:  I think that's everything. |
| 10:25 | 3 | I have one small nuance that -- just something |
| | 4 | that was said earlier on, which was that the paving over of |
| | 5 | the Montrose plant raised concern, was actually the |
| | 6 | opposite.  That's more in the nature of some temporary |
| | 7 | protection for the public. |
| 10:25 | 8 | THE COURT:  Oh, I see. |
| 10:25 | 9 | MS. GITIN:  And other than that, I just wanted to |
| | 10 | thank Your Honor, and also thank Judge Standish for what it |
| | 11 | took to get us to this point and those two consent decrees. |
| | 12 | We thank you for the opportunity to finalize the settlement |
| | 13 | negotiations that we were engaged so intensely in around the |
| | 14 | holidays. |
| 10:25 | 15 | THE COURT:  I want to thank all of you for |
| | 16 | disturbing your holidays between Christmas and New Year's. |
| | 17 | I know that that was a burden on you.  But I needed to set |
| | 18 | this in motion and I could only do that between Christmas |
| | 19 | and New Year's.  So thank you for the phone calls and the |
| | 20 | intrusion into your lives. |
| 10:26 | 21 | Counsel, on behalf of Montrose, any further |
| | 22 | comments? |
| 10:26 | 23 | **COMMENTS BY MR. RICHARDSON** |
| 10:26 | 24 | MR. RICHARDSON:  Your Honor, we -- we agree with |
| | 25 | plaintiffs.  And thank you for the support in this.  This |

|      |    |                                                              |
|------|----|--------------------------------------------------------------|
|      | 1  | marks -- these two consent decrees mark the culmination of   |
|      | 2  | decades of technical studies.  And these -- they're clearly  |
|      | 3  | in the public interest, and we appreciate your efforts on    |
|      | 4  | this.                                                        |
| 10:26 | 5  | THE COURT:  Counsel, would you identify the party          |
|      | 6  | you represent and if you have any further comment.          |
| 10:26 | 7  | MR. HSIAO:  No further comment.                            |
| 10:26 | 8  | THE COURT:  And you represent?                             |
| 10:26 | 9  | MR. HSIAO:  TFCF America.                                  |
| 10:26 | 10 | THE COURT:  And the only counsel with us who              |
|      | 11 | was -- you deserve, once again, to have your name on the     |
|      | 12 | record.                                                     |
| 10:26 | 13 | MR. ALLEN:  Yes, Your Honor.  Jose Allen again.           |
|      | 14 | This is a very important milestone in this matter.  And we   |
|      | 15 | are very pleased and thrilled that we've been able to        |
|      | 16 | achieve it today thanks to your effort in encouraging this   |
|      | 17 | matter to move forward.                                     |
| 10:26 | 18 | THE COURT:  Thank you.                                     |
| 10:26 | 19 | MR. DONALD:  Stauffer Management Company and Bayer         |
|      | 20 | CropScience.  Concur with Mr. Allen.                        |
| 10:27 | 21 | THE COURT:  All right.                                     |
| 10:27 | 22 | You have my representation that, tentatively,              |
|      | 23 | unless I hear something during the Pathways discussion, that |
|      | 24 | I'll be signing that at the conclusion of the Pathways       |
|      | 25 | discussion.                                                 |

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 68 of 97   Page ID #:15678
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

68

10:27  1          Why don't you take a recess.  I've got other

2     counsel to speak to informally who've been waiting on

3     another matter.

10:27  4          But I wanna take the time with all of you folks,

5     coming in from all over the country after 30 years, so let

6     me humbly apologize to the next matter sitting.

10:27  7          We'll come back in about 30 minutes.

10:27  8          MS. GITIN:  Should we clear the tables in the

9     meantime?

10:27 10          THE COURT:  No.  I'm just going to talk to them

11     informally for a moment, just apologize to them.  The

12     litigation is rampant here.

10:27 13          Okay.  All right.  We'll see you at 11:00 o'clock.

10:27 14          MR. RICHARDSON:  Thank you, Your Honor.

10:27 15          *(Proceedings recessed at 10:27 a.m.)*

10:59 16          *(Proceedings resumed at 10:59 a.m.)*

10:59 17          THE COURT:  All right.  Then -- all right.  We're

18     back on the record and all parties are present.

10:59 19          **COURT'S REMARKS/QUESTIONS RE SOUTHERN PATHWAY**

10:59 20          THE COURT:  Counsel, with your consent, I'd like

21     to discuss the third and last consent decree, the

22     Southern Pathway Consent Decree.  And this, of course, is

23     the actual performance and remedial investigation and

24     feasibility study of the Southern Pathway portion of the

25     site.  We've, from the beginning of our relationship,

                referred to this as the "Southern Pathway" portion or

                "Historic Stormwater Pathway South."

11:00           And this is an area that -- of the site for which

                liability and costs have been disputed.  And there was an

                issue in the now-vacated trial that saw the parties in some

                initial disagreement.

11:01           Once again, this consent decree commits to perform

                the Southern Pathway Remedial Investigation and Feasibility

                Study, which is a full investigation of DDT and other

                contamination in the Southern Pathway OU and a full

                feasibility study of alternatives for remediating such

                containment as described by CERCLA.  And, once again,

                without the signing of this consent decree, we can't go

                forward with any remediation.

11:01           Settling defendants liability for costs and work

                in the area of the site has been contested in the

                litigation.  But now there's a commitment to perform and pay

                for the Pathway Remedial Investigation and Feasibility

                Study, regardless of its extent, duration and expense,

                subject to only some certain specified limitations.

11:02           It's been represented to this Court that the entry

                of this consent decree would partially resolve plaintiffs'

                claims in the civil action against settling defendants,

                which include all remaining defendants to this litigation.

11:02           As part of the commitment, settling defendants

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 70 of 97  Page ID
#:15680
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

70

1  will also incorporate data from preexisting sampling

2  performed by EPA and others in the Southern Pathway, and

3  will pay $3.75 million to EPA and $250,000 to DTSC for

4  previously incurred response costs primarily related to the

5  Southern Pathway OU.  This appears to be highly beneficial

6  to the public, given the circumstances of the litigation.

11:03  7       The consent decree has been represented to serve

8  judicial economy, stewardship of public resources, ending

9  active litigation in the case that spans over three decades

10  and 3,000 docket events.

11:03  11       And the plaintiffs believe that, with judicial

12  approval of the CERCLA consent decrees, that the consent

13  decree substantially and procedurally is fair, reasonable,

14  and consistent with CERCLA's purpose of having the

15  potentially responsible parties perform and fund cleanup

16  work, preferably through settlement.

11:03  17       The information that the Court has is that the

18  Southern Pathway OU is that area containing containment

19  soils at the site that begins south of Torrance Boulevard

20  and less than half a mile southeast of the Montrose plant

21  property.  And that will become important in a moment in

22  some of the comments that the Court's received.

11:04  23       Seven adjacent residences, the "residential

24  properties," the former Royal Boulevard landfill, a

25  downgraded area, the site investigation area beginning

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 71 of 97   Page ID
#:15681
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

71

          1    outside that landfill and extending to the intersection of

          2    Torrance Boulevard and South Vermont Avenue and the segment

          3    between South Vermont Avenue and the Dominguez Channel.

11:05     4              The Southern Pathway OU drains surface water from

          5    the Montrose plant property and surrounding areas south of

          6    Torrance Boulevard to the Dominguez Channel through natural

          7    sloughs, ponds, drainages beginning in the 1940s.  And over

          8    time this historic stormwater pathway was replaced by modern

          9    stormwater infrastructure, including culverts and concrete

         10    channels.  This infrastructure work was completed in the

         11    early 1970s.

11:05    12              And the parties agree that hazardous substances,

         13    including DTT -- DDT have been found at the ECI property and

         14    the adjacent residential properties within the Southern

         15    Pathway OU, though there's some disagreement as to whether

         16    the Montrose plant property is the source of that

         17    contamination.

11:06    18              EPA has already performed or overseen

         19    investigation work with the support from DTSC, including

         20    extensive soil sampling at the ECI property and adjacent

         21    residential properties.

11:06    22              The plaintiffs' claims at trial for $3,562,950.24

         23    in the United States' response costs, and $234,133.30 --

         24    38 cents -- in DTS response costs, include unreimbursed

         25    response costs that plaintiffs have incurred in performing

| | | |
|---|---|---|
| | 1 | this work and related actions in the Southern Pathway. |
| | 2 | However, extensive investigation work has not yet occurred |
| | 3 | further down gradient in the Southern Pathway OU. |
| 11:06 | 4 | And accordingly, what I call the next step in the |
| | 5 | CERCLA process, is the completion of this "remedial |
| | 6 | investigation feasibility" study for the Southern Pathway |
| | 7 | OU, which is before the Court, and which will incorporate |
| | 8 | data from previous investigations around the ECI property |
| | 9 | and adjacent residential properties, as well as the previous |
| | 10 | human health risk assessments and ecological risk |
| | 11 | assessments, and will perform the necessary investigation |
| | 12 | and sampling further downstream in the Southern Pathway OU. |
| 11:07 | 13 | And remedial investigation study is a required |
| | 14 | step in EPA's CERCLA process for selecting a cleanup remedy |
| | 15 | for a portion of a superfund site.  Either EPA or |
| | 16 | potentially responsible parties can perform A-R-F [sic] or |
| | 17 | RIFS.  But, as with all CERCLA work, there's a preference |
| | 18 | for responsible parties to perform and fund this work under |
| | 19 | EPA's supervision.  And the purpose of the RIFS is to assess |
| | 20 | site conditions and evaluate alternatives to the extent |
| | 21 | necessary to select the remedy. |
| 11:08 | 22 | In the case of the Southern Pathway OU the parties |
| | 23 | intend to pursue a cooperative resolution of the cleanup |
| | 24 | once the RIFS has been completed and EPA selects any remedy |
| | 25 | necessary and documents in its Record of Decision, which |

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 73 of 97   Page ID #:15683
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

73

1    then could lead to further consent decrees, as the Court

2    understands.

11:08    3         So I want to turn to the terms of the proposed

4    consent decree and go through each one of those to make

5    certain that we have that discussion, instead of trading

6    emails or working through, indirectly, other sources that

7    are time-consuming.

11:08    8         Settling defendants, as I understand it, will

9    perform the RIFS in order to determine the nature and extent

10   of DDT and other contaminaries -- contamination in the

11   unstudied portions of the Southern Pathway to assess risk to

12   human health and the environment.  And that includes,

13   amongst other things, collecting data to characterize the

14   site conditions, assessing risk to human health, conducting

15   treatability testing as necessary, and also alternatives may

16   be evaluated, but must include a range of alternatives

17   described in NCP40, CFR, Section 300 --

11:09    18         *(Court reporter requests clarification for the*

19         *record.)*

11:09    20         THE COURT:  NCP40 CFR, Section 300.430,

21   subsection (E).

11:09    22         -- and shall include remedial actions that use

23   permanent solutions and alternative treatment technologies

24   or resource recovery technologies to the maximum extent

25   practicable.

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 74 of 97   Page ID
#:15684
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

74

11:10    1           Initially settling defendants will perform a field

         2    site investigation referred to as the "site investigation

         3    area."  This area consists of 34 residential properties

         4    between the former Royal Boulevard landfill and the

         5    intersection of South Vermont Avenue and Torrance Boulevard.

         6    The area represents the estimated extent of the former

         7    slough area where contamination stormwater would most likely

         8    to have been deposited prior to installation of modern

         9    infrastructure.

11:10   10           From my memory, though, you're actually conducting

        11    54 sites.  And eventually I need to understand where those

        12    others are occurring besides these residential.  And I'll

        13    come back to that in a moment.

11:10   14           In committing to perform the sampling of all 34

        15    residential parcels and the site, it's my understanding that

        16    there's going to be, initially, one soil boring from the

        17    ground surface down to depths -- taking soil samples -- and

        18    you've set that out for the Court in depths .5, 2.5, 5.0,

        19    7.5 and 10 feet below ground surface in 28 of the 34

        20    parcels.

11:11   21           First question:  I don't understand what's

        22    happening with the other six parcels.

11:11   23           MS. GITIN:  So in all 34 parcels, the sampling

        24    will be done at the depths that you just described:  From

        25    0.5 feet below ground surface down to 10 feet below ground

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | surface.                                                   |
| 11:11 | 2  | In those last six parcels we will additionally -- |
|       | 3  | uh, sorry.  In 28 -- so in all 34 parcels that will occur. |
| 11:12 | 4  | THE COURT:  Okay.                                 |
| 11:12 | 5  | MS. GITIN:  In 28 of the 34 parcels, additional |
|       | 6  | sampling will occur at greater depths.  In the other six it |
|       | 7  | was deemed not necessary.                                  |
| 11:12 | 8  | THE COURT:  But with one boring?                 |
| 11:12 | 9  | MS. GITIN:  Correct.                             |
| 11:12 | 10 | So the single boring takes samples from -- |
| 11:12 | 11 | THE COURT:  Later on --                          |
| 11:12 | 12 | MS. GITIN:  -- each parcel there's one boring but |
|       | 13 | multiple samples.                                          |
| 11:12 | 14 | THE COURT:  Later on there'll be a concern about |
|       | 15 | the number of borings and the placement, which is why I want |
|       | 16 | this record.                                               |
| 11:12 | 17 | You'll further sample at a depth of which native |
|       | 18 | Southern Pathway OU soils appear, whatever that depth may |
|       | 19 | be, in order to confirm full range depth at which the DDT |
|       | 20 | may've been deposited.                                     |
| 11:12 | 21 | Are those that -- additional boring samples? |
| 11:12 | 22 | MS. GITIN:  Correct.                             |
| 11:12 | 23 | THE COURT:  Okay.                                 |
| 11:12 | 24 | So, in addition, analyzing the soil, settling |
|       | 25 | defendants must also analyze any white material --         |

11:12    1          *(Court reporter requests clarification for the*
         2      *record.)*

11:12    3              THE COURT:  White, yeah.  W-H-I-T-E.

11:12    4              -- material observed within the boring that could

         5      be suspected to be DDT, regardless of the department at

         6      which the white material occurs.

11:13    7              So let's say we get to 10 feet, we have white

         8      material, does the boring then go deeper?  In other words,

         9      let's say we get to a layer of white material but our actual

        10      document says 10 feet.

11:13   11              What do we do?

11:13   12              MS. GITIN:  So I guess, Your Honor, it might

        13      depend on where it was.  If you found a white --

11:13   14              THE COURT:  I just gave it you to.  It's 10 feet

        15      because right now your limitation is 10 feet.  I didn't take

        16      7.5 'cause I know you're going --

11:13   17              MS. GITIN:  I see.

11:13   18              THE COURT:  -- so I placed this in the position

        19      now, hypothetically, 10 feet.

11:13   20              MS. GITIN:  If we have data that suggests that

        21      there's contamination, we will -- we will look further.

11:13   22              THE COURT:  Okay.

11:13   23              That agreed to by all parties?  Are we gonna look

        24      further?

11:13   25              MR. RICHARDSON:  The data reflects that, yes,

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 77 of 97   Page ID #:15687
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

77

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
|        | 1  | Your Honor.                                                |
| 11:13  | 2  | THE COURT:  Okay.                                           |
| 11:13  | 3  | MS. GITIN:  And we'd also, of course, test the             |
|        | 4  | white material to see whether it's DDT or whether it's, you |
|        | 5  | know, anything else.                                       |
| 11:14  | 6  | THE COURT:  No.  I understand.  I just wanted to           |
|        | 7  | take the worst projection I could think of.  What happens if |
|        | 8  | we got to 10 feet, we had white material.  I wanna make    |
|        | 9  | certain we're not tied to a document that limits us to     |
|        | 10 | 10 feet.                                                   |
| 11:14  | 11 | MS. GITIN:  That's correct.                                |
| 11:14  | 12 | THE COURT:  Fair enough.                                   |
| 11:14  | 13 | All right.  Now, you're going to take initial             |
|        | 14 | sampling of 198 soil samples from these 34 borings with five |
|        | 15 | to six samples per boring.  You're gonna analyze them for  |
|        | 16 | broad range of contaminates, and not only for DDT, which are |
|        | 17 | associated with operation'a the Montrose site, but for other |
|        | 18 | pesticides; and those include polychlorinated, P-O-L-Y,    |
|        | 19 | C-H-L-O-R-I-N-A-T-E-D, biphenyls, B-I-P-H-E-N-Y-L-S, and for |
|        | 20 | volatile organic compounds and petroleum hydrocarbons.     |
| 11:15  | 21 | Counsel, I understand that.                                |
| 11:15  | 22 | Okay.  The investigation includes contaminants not        |
|        | 23 | specifically listed with the Montrose site in order to     |
|        | 24 | assess the nature and extent of contamination to human     |
|        | 25 | health and environment.                                    |

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

78

11:15   1            So they're argue [sic] having that crossover from

2       the dual site -- is that what's occurring?

11:15   3            MS. GITIN:  Or from anything else that may be in

4       the area.

11:15   5            THE COURT:  All right.

11:15   6            Now, this is critical to me, and I think you have

7       my compliments.  If, and only if, every one of these soil

8       samples tested -- and I want to state that again -- every

9       one of these soil samples tested, each of which is analyzed

10      for many contaminates, shows no contamination above certain

11      screening levels for any contaminate, which is end point

12      criteria, then fieldwork shall be deemed complete after

13      sampling analysis of the tested 198 soil samples is

14      complete.

11:16   15           That's absolutely clear to the Court.  In a,

16      moment we're going to talk about where the boring occurs and

17      what the objections are concerning one boring per residence.

11:16   18           If any contamination above the end point criteria

19      is found in even one soil sample for DDT-related

20      contaminants or other specified contaminates, then EPA can

21      require settling defendants to continue the site

22      investigation, completing additional fieldwork to EPA's

23      satisfaction until the goals of the "RI" are met.

11:16   24           Does that also mean that, if we get to a depth of

25      10 feet again, that we would then extend deeper?  Or would

1    we go lateral?  Or are we simply waiting with all those

2    unknowns to try to ferret out what those unknowns are in the

3    future so we can get started and see what we've got?

11:17    4           That's really where we are, aren't we?

11:17    5           MS. GITIN:  We --

11:17    6           THE COURT:  In other words, let's get started.

7    See what we've finally got after 30 years.

11:17    8           MS. GITIN:  Correct.

11:17    9           THE COURT:  Okay.

11:17   10           MS. GITIN:  We would go where the data would lead

11    us.

11:17   12           THE COURT:  So the net present valuation of the

13    initial investigation's a little over $500,000.  $518,000.

11:17   14           And, of course, CD, if I misstated, is to

15    recover -- or, I mean, in the Consent Decree there's gonna

16    be a recovery of $3,750,000 for EPA and $250,000 for DTSC in

17    previously unreimbursed response costs.

11:17   18           There's some other terms that are -- the settling

19    defendants received covenants not to sue from the

20    United States and DTSC only for those specified matters and

21    subject to various reservations of rights.  So the legal

22    entry [sic] for entry of this judgment -- to repeat, 'cause

23    each document is separate, in and of itself, is --

11:18   24           "The standard for approval of a CERCLA

25               federal settlement is whether it is

|       |    |                                                     |
|-------|----|-----------------------------------------------------|
|       | 1  | reasonable, fair, and consistent with               |
|       | 2  | the purposes that CERCLA is intended to             |
|       | 3  | serve --"                                            |
| 11:18 | 4  | As the Ninth Circuit has held in this very case,    |
|       | 5  | *United States v. Montrose,* 50 F.3d 741, at 743,   |
|       | 6  | Ninth Circuit (1995).                               |
| 11:18 | 7  | "-- and the approval of a settlement is             |
|       | 8  | committed to the informed discretion of             |
|       | 9  | the District Court.  Such discretion                |
|       | 10 | should be exercised in light of the                 |
|       | 11 | strong policy in favor of voluntary                 |
|       | 12 | settlement of litigation and CERCLA has             |
|       | 13 | explicit provisions favoring                        |
|       | 14 | settlement."                                         |
| 11:18 | 15 | The argument and representation is that the Court   |
|       | 16 | should find this to be substantively fair because settling |
|       | 17 | defendants are making an opened-ended commitment -- and I  |
|       | 18 | repeat that -- an open-ended commitment to complete the    |
|       | 19 | RIFI -- RIFS study regardless of its cost.          |
| 11:19 | 20 | And the --                                           |
| 11:19 | 21 | *(Court reporter requests clarification for the*   |
|       | 22 | *record.)*                                           |
| 11:19 | 23 | THE COURT:  And the settling defendants are also    |
|       | 24 | agreeing to pay the response costs that the Court just |
|       | 25 | stated.  It's represented -- and I quote:           |

11:19   1                    "This recovery is particularly robust

        2                    given the unusual procedure of the

        3                    previously set trial where plaintiff had

        4                    been required by the Court, then

        5                    Judge Klausner, to proceed to trial on

        6                    Southern Pathway OU liability and costs

        7                    before completing the Southern Pathway

        8                    OU investigation."

11:19   9            And apparently both parties feel that, obviously

       10    from your standpoint, that before we ever got into

       11    litigation, we need to go through this process first to see

       12    what we have, to be informed.

11:20  13            There's representation that's procedurally fair

       14    because it spanned three decades and over 3,000 docket

       15    entries.  And it seems to me that this is the first step

       16    forward in a remedial fashion to alleviate and attempt to

       17    alleviate these hazards.

11:20  18            Now, correct me if I'm wrong, because I know that

       19    there's been monitoring.  There's been some containment,

       20    *et cetera*, some retrieval.  But this seems to be a

       21    tremendous leap forward by the parties.

11:20  22            MR. RICHARDSON:  Yes, Your Honor.

11:20  23            THE COURT:  All right.  I think all parties' in

       24    agreement.

11:20  25            Then I would need to find that the decrees' likely

         1    a vehicle for cleansing the environment.  And I need to

         2    consider whether these adequately represent and compensate

         3    the public for costs of response and remediation, of which

         4    all parties are in agreement; and that the defense will

         5    fully perform the RIFS regardless of extent or duration,

         6    which I now have on the record, and will pay all agency

         7    oversight costs, and must perform the investigation to EPA's

         8    satisfaction, with concurrence of DTSC.  You'll be guided by

         9    the national contingency plan.

11:21   10         And the settling defendants' commitment to fully

        11    perform the RIFS at their own expense --

11:21   12         *(Court reporter requests clarification for the*

        13         *record.)*

11:21   14         THE COURT:  -- own expense except for specifically

        15    enumerated exceptions, is very favorable, given the

        16    litigation posture for this portion of the site.

11:21   17         More importantly, this open-ended nature of the

        18    investigation, unless specific endpoint criteria are met for

        19    all DDT-related contaminates and all samples and the

        20    consideration of all appropriate remedial and alternatives

        21    in the feasibility study -- appears to this Court to protect

        22    the public interest, the plaintiffs' interest in protecting

        23    human health and the environment -- is consistent with

        24    CERCLA.

11:22   25         So now I wanna turn to the comment section and

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 83 of 97   Page ID #:15693
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

83

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | make certain that the Court has adequately and thoroughly            |
|        | 2  | asked questions and is satisfied.                                     |
| 11:22  | 3  | **COURT'S INQUIRY RE DAAC COMMENT RE SCOPE OF RI**                   |
| 11:22  | 4  | THE COURT:  One comment letter was received from                     |
|        | 5  | Del Amo Action Committee.  It states that they have concerns         |
|        | 6  | about the scope of the RI.                                            |
| 11:22  | 7  | First, Del Amo asked why 34 parcels, rather than                     |
|        | 8  | 56, were included in the initial site investigation for the         |
|        | 9  | RI.                                                                   |
| 11:22  | 10 | Second, DAAC objects to the scope being narrowed                     |
|        | 11 | even further by requiring only one boring per yard with a           |
|        | 12 | "step out" if they do detect a needle in the haystack.              |
| 11:23  | 13 | The response from EPA is that they came to                           |
|        | 14 | their -- your decisions about the scope of the IR -- RI             |
|        | 15 | through the application of technical expertise and review of        |
|        | 16 | the existing plan after consultation with DTS and with              |
|        | 17 | several offices.  And such technical decision-making is             |
|        | 18 | entitled to judicial deference.                                      |
| 11:23  | 19 | Plaintiffs' provided specific responses to DAAC's                    |
|        | 20 | concerns about the scope.                                             |
| 11:23  | 21 | When were those responses to Del Amo?                                |
| 11:23  | 22 | MS. GITIN:  I think here we're just talking about                    |
|        | 23 | responses in the brief.  We haven't engaged with Del Amo            |
|        | 24 | specifically on their comments to this consent decree,              |
|        | 25 | though EPA and the Del Amo Action Committee have fairly             |

| | | |
|---|---|---|
| | 1 | frequent conversations about the site because we do believe |
| | 2 | that -- |
| 11:24 | 3 | THE COURT:  I'm sorry.  Would you repeat that?  I |
| | 4 | couldn't hear. |
| 11:24 | 5 | MS. GITIN:  EPA and the Del Amo Action Committee |
| | 6 | do have fairly frequent communications about the site, |
| | 7 | whether in writing or on the phone, because they're an |
| | 8 | entrusted community partner.  And we talk to them when they |
| | 9 | have concerns. |
| 11:24 | 10 | THE COURT:  Give me an idea -- because I got |
| | 11 | concerned with that, you know, brief hiatus when I saw it. |
| 11:24 | 12 | MS. GITIN:  Sure.  I know -- obviously, I don't |
| | 13 | have a record of every phone call.  I -- I do have -- we |
| | 14 | have letters that were exchanged back and forth. |
| 11:24 | 15 | So, for instance, there's a letter from the |
| | 16 | director of the superfund division at EPA Region 9 to the |
| | 17 | Del Amo Action Committee, talking to them about various |
| | 18 | community involvement concerns and telling them that, if |
| | 19 | they ever want separate meetings beyond the public meetings, |
| | 20 | that they can have them. |
| 11:25 | 21 | THE COURT:  And when?  That's what I'm uncertain |
| | 22 | of. |
| 11:25 | 23 | MS. GITIN:  That's in April 2021, I believe.  Let |
| | 24 | me doublecheck. |
| 11:25 | 25 | MR. RICHARDSON:  Your Honor, I -- |

| | | |
|---|---|---|
| 11:25 | 1 | MS. GITIN:  April 5th.  April 5, 2021. |
| 11:25 | 2 | THE COURT:  Okay.  Thank you. |
| 11:25 | 3 | Counsel? |
| 11:25 | 4 | MR. RICHARDSON:  I also believe there was a June |
| | 5 | public meeting that involved this -- these issues as well. |
| 11:25 | 6 | THE COURT:  So there's been a public meeting as |
| | 7 | recently as June.  And describe that public meeting.  Was |
| | 8 | Montrose present?  EPA present?  Was it located here in the |
| | 9 | Los Angeles area?  Was the community involved or invited? |
| 11:25 | 10 | MS. GITIN:  Um, it was a virtual meeting this time |
| | 11 | because of COVID.  Normally they are held in person near the |
| | 12 | site. |
| 11:25 | 13 | So every six months, um, going back quite a ways, |
| | 14 | there are public meetings about the Montrose and Del Amo |
| | 15 | sites. |
| 11:25 | 16 | THE COURT:  But you switched to a virtual meeting |
| | 17 | because of COVID? |
| 11:25 | 18 | MS. GITIN:  Yes. |
| 11:25 | 19 | THE COURT:  Okay. |
| 11:25 | 20 | MS. GITIN:  And, in addition, Mr. Minor tells me |
| | 21 | that we've been -- that EPA has been in phone conversations |
| | 22 | with the Del Action -- Del Amo Action Committee in the last |
| | 23 | couple of weeks. |
| 11:26 | 24 | THE COURT:  Is that correct? |
| 11:26 | 25 | MR. MINOR:  Yes. |

| | | |
|---|---|---|
| 11:26 | 1 | THE COURT: Could you describe to me? I don't |
| | 2 | need to know the comment. But use the microphone. |
| 11:26 | 3 | MS. GITIN: This is Mr. Minor. |
| 11:26 | 4 | THE COURT: I want to make sure that the parties |
| | 5 | are truly notified. |
| 11:26 | 6 | MR. MINOR: Yes, um, um, Ms. Babich, from the |
| | 7 | Del Amo Action Committee has had several -- or at least two |
| | 8 | phone calls that I'm aware of -- |
| 11:26 | 9 | *(Court reporter requests clarification for the* |
| | 10 | *record.)* |
| 11:26 | 11 | THE COURT: At Region 9? |
| 11:26 | 12 | MR. MINOR: Yes, um, to talk about her concerns |
| | 13 | about the site. And so there've been at least two phone |
| | 14 | calls back from managers to discuss concerns with her in the |
| | 15 | last few weeks. |
| 11:26 | 16 | THE COURT: And before I considered and asked |
| | 17 | about administratively closing the case, it didn't make a |
| | 18 | difference in terms of how the Court supervised it, but I'm |
| | 19 | growing a little bit leery of that. I think I'm going to |
| | 20 | reverse myself on that and keep the case open and active on |
| | 21 | the file so that Del Amo understands that they have access |
| | 22 | through you and through the Court; otherwise, that could be |
| | 23 | misread as a closed case, which is silly. But folks aren't |
| | 24 | lawyers. Okay? |
| 11:27 | 25 | So if any contamination found above the |

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 87 of 97  Page ID #:15697
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

87

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | conservative endpoint criteria, once again, you're going to          |
|       | 2  | allow additional sampling to be performed elsewhere beyond           |
|       | 3  | the 34 lots.  I took that in my reading to mean that you             |
|       | 4  | could also take another boring sample on one of those 34            |
|       | 5  | lots; is that correct?                                               |
| 11:27 | 6  | MS. GITIN:  Yes.  That's --                                           |
| 11:27 | 7  | THE COURT:  Okay.                                                     |
| 11:27 | 8  | MS. GITIN:  -- something we could ask Montrose to                     |
|       | 9  | do if the -- the data warranted it.                                  |
| 11:27 | 10 | THE COURT:  Okay.  All right.                                         |
| 11:27 | 11 | And so that might resolve what I call the overlap                     |
|       | 12 | problem that Del Amo raised; and that is, what happens if            |
|       | 13 | you're just getting a corner of the contamination.                   |
| 11:28 | 14 | The next is that there was a disagreement that                       |
|       | 15 | taking one boring --                                                 |
| 11:28 | 16 | *(Court reporter requests clarification for the*                     |
|       | 17 | *record.)*                                                           |
| 11:28 | 18 | THE COURT:  -- per yard might somehow miss all                       |
|       | 19 | contamination within the site investigation area and produce        |
|       | 20 | a false negative.                                                    |
| 11:28 | 21 | First, you pointed to the depth again.  That                         |
|       | 22 | wasn't really their question.  But you pointed to five              |
|       | 23 | samples from each boring.                                            |
| 11:28 | 24 | But second, the likelihood of a false negative is                   |
|       | 25 | greatly lessened by the structure of the endpoint criteria.         |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | You've told me that it is only if no contamination -- I      |
|        | 2  | repeat that -- no contamination above these criteria is      |
|        | 3  | found in any of the initial approximately 198 samples        |
|        | 4  | throughout the initial site investigation area that the      |
|        | 5  | investigations will be limited to just those samples.        |
| 11:29  | 6  | So if you find even one contamination, what do you           |
|        | 7  | do? -- or you do then go back to your experts at that time,  |
|        | 8  | and we don't try to define it at this time, and that's where |
|        | 9  | the interplay comes in?  And that's where I would expect to  |
|        | 10 | see Del Amo come into my court and want, you know,           |
|        | 11 | additional borings or additional sites and there might be a  |
|        | 12 | contention.                                                  |
| 11:29  | 13 | Is that your understanding?                                  |
| 11:29  | 14 | MS. GITIN:  I don't think there would likely be a            |
|        | 15 | contention, Your Honor.  If -- if the data suggests that     |
|        | 16 | additional sampling is necessary, we'll ask Montrose to do   |
|        | 17 | it.  And by "ask," I don't mean ask politely.  They're       |
|        | 18 | required by the Statement of Work for this consent degree to |
|        | 19 | do it.  It really is the agency's decision.  And if we find  |
|        | 20 | contamination --                                             |
| 11:29  | 21 | THE COURT:  Sure.                                            |
| 11:29  | 22 | MS. GITIN:  -- we will ask them to look further.             |
| 11:30  | 23 | THE COURT:  And the point is, if there's a                   |
|        | 24 | disagreement, they have always got accessibility --          |
| 11:30  | 25 | MS. GITIN:  Correct.                                         |

| | | |
|---|---|---|
| 11:30 | 1 | THE COURT:  -- to the Court. |
| 11:30 | 2 | MS. GITIN:  They can come to us. |
| 11:30 | 3 | THE COURT:  EPA first, of course, but back to the |
| | 4 | Court. |
| 11:30 | 5 | MS. GITIN:  I'm not sure what they're standing -- |
| 11:30 | 6 | THE COURT:  Well, let's -- |
| 11:30 | 7 | *(Simultaneous speaking.)* |
| 11:30 | 8 | MS. GITIN:  I can -- yeah. |
| 11:30 | 9 | THE COURT:  Yeah.  That's what I'm exploring.  I |
| | 10 | want to make certain that Del Amo has the feeling that all |
| | 11 | decision-making starts -- stops, if I sign the consent |
| | 12 | decree, they have no access in the future, that everything |
| | 13 | is then governed by EPA and the parties. |
| 11:30 | 14 | If there's a continuing dispute, then I need to |
| | 15 | know that there's some accessibility back to EPA to begin |
| | 16 | with -- |
| 11:30 | 17 | MS. GITIN:  Uh-huh. |
| 11:30 | 18 | THE COURT:  -- obviously.  But I don't want that |
| | 19 | that -- |
| 11:30 | 20 | MS. GITIN:  So -- |
| 11:30 | 21 | THE COURT:  -- to be a complete cutoff. |
| 11:30 | 22 | MS. GITIN:  -- you have continuing jurisdiction |
| | 23 | over these consent decrees. |
| 11:31 | 24 | THE COURT:  It makes no difference whether it's a |
| | 25 | closure administratively or I keep it active. |

| 11:31 | 1 | MS. GITIN:  That is correct. |

11:31    1          MS. GITIN:  That is correct.

11:31    2          THE COURT:  I prefer just to keep it active.

11:31    3          MS. GITIN:  And there's a dispute resolution

4    provision within the consent decree that, if there's a

5    dispute among the parties, that it would be handled first

6    informally and then, if needed, brought to the Court's

7    attention.

11:31    8          THE COURT:  Excellent.  That gives me, I think,

9    the guarantee, and I think that gives them the

10   accessibility.  All right.  Then --

11:31   11          MS. GITIN:  And we agree that administratively

12   closing the case would have no preclusion in that regard.

13   Your jurisdiction is what the consent degree says it is.

11:31   14          THE COURT:  It could be misread.  So keeping it

15   active may be more appropriate.

11:31   16          And finally, I wanna make certain, and I think

17   it's clear, that if any one soil sample at any depth shows

18   contamination above this endpoint criteria, then the

19   investigation may not be limited to that initial sampling.

11:32   20          Correct?

11:32   21          MR. RICHARDSON:  Correct, Your Honor.

11:32   22          THE COURT:  Okay.

11:32   23          MR. RICHARDSON:  I believe that the -- that's when

24   it goes back to the experts on both -- both sides, and they

25   look at the multiple lines of evidence, including chemistry

Case 2:90-cv-03122-DOC-GJS   Document 3084   Filed 11/08/21   Page 91 of 97   Page ID #:15701
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

91

|  |  |  |
|---|---|---|
|  | 1 | data, geology, the location -- they compile all that |
|  | 2 | multiple lines of evidence and then EPA decides whether we |
|  | 3 | proceed with additional work. |
| 11:32 | 4 | THE COURT: Yeah. The next one is access. And I |
|  | 5 | was curious, and that is, DAAC's concerns about what would |
|  | 6 | happen in the event a resident refuses sampling. |
| 11:32 | 7 | I was somewhat baffled. First of all, I couldn't |
|  | 8 | imagine a resident refusing sampling when it's a remedial |
|  | 9 | effort of this extent -- |
| 11:32 | 10 | MS. GITIN: It's certainly -- |
| 11:32 | 11 | THE COURT: -- to alleviate -- |
| 11:32 | 12 | *(Simultaneous speaking.)* |
| 11:32 | 13 | THE COURT: -- and second, if that occurred, we'll |
|  | 14 | deal with that at the time. I have no resolution for that, |
|  | 15 | and I think that's a parade of horribles that we need to |
|  | 16 | wait to see if it occurs. I just can't imagine why a |
|  | 17 | resident would say, "I don't want soil sampling." |
| 11:33 | 18 | MR. RICHARDSON: Your Honor, I think that's right. |
|  | 19 | And there are alternatives. If -- if a resident refuses |
|  | 20 | sampling, we may able'a sample in the street by that |
|  | 21 | resident's home -- |
| 11:33 | 22 | THE COURT: Okay. |
| 11:33 | 23 | MR. RICHARDSON: -- or another public |
|  | 24 | right-of-way. But you're right: That -- that's an issue |
|  | 25 | that's addressed at the time or actually -- |

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

92

| | | |
|---|---|---|
| 11:33 | 1 | THE COURT:  And let's say you had a contamination, |
| | 2 | a small contamination zone between two residences.  Let's |
| | 3 | say that you did a boring on property one, and you picked up |
| | 4 | contamination and it seemed to be, as you traced it, going |
| | 5 | toward property two, but property two refused.  You'd still |
| | 6 | have a pretty good idea of that flow. |
| 11:33 | 7 | And about that time I would have to really wonder |
| | 8 | why property two wouldn't be giving consent, knowing of |
| | 9 | that.  So I think we need to lay that aside as a worse case |
| | 10 | scenario that shouldn't hold up, uh, this decree. |
| 11:34 | 11 | **COURT'S INQUIRY RE RI WORK PLAN** |
| 11:34 | 12 | THE COURT:  The next comment was that there -- |
| | 13 | Del Amo's asking that the RI work plan include |
| | 14 | Kenwood Avenue, the ECI property, the seven adjacent |
| | 15 | propers [sic] to ECI, and the Royal Boulevard landfill, |
| | 16 | regardless of who pays. |
| 11:34 | 17 | And the response was: |
| 11:34 | 18 | "The RIFS does not require settling |
| | 19 | defendants to incorporate the |
| | 20 | findings" -- |
| 11:34 | 21 | *(Court reporter requests clarification for the* |
| | 22 | *record.)* |
| 11:34 | 23 | MS. GITIN:  And, actually, Your Honor -- |
| 11:34 | 24 | THE COURT:  Now, just -- just -- |
| 11:34 | 25 | MS. GITIN:  -- RIFS does require. |

11:34   1          I believe you said "does not."  But the RIFS does

        2   require settling defendants, *et cetera*.

11:34   3          THE COURT:  Oh, did I say "does not"?  My

        4   apologies.

11:35   5          The RIFS does require, yeah, settling defendants

        6   to incorporate the findings of the ECI property and the

        7   seven adjacent residential properties.

11:35   8          Thank you very much for correcting me.

11:35   9          MS. GITIN:  Thank you, Your Honor.

11:35  10          THE COURT:  That's -- and where the EPA's

       11   performed or overseen extensive samplings, as well as

       12   samplings previously done at the Royal Boulevard landfill.

11:35  13          And, apparently, the RI work plan for the Southern

       14   Pathway does not include Kenwood Avenue because

       15   Kenwood Avenue is not within the OU; is that correct?

11:35  16          MS. GITIN:  (No response.)

11:35  17          THE COURT:  I wanna apologize.  I don't

       18   understand.

11:35  19          Why wasn't it? -- not that it should be.  Was it

       20   prior studies that were done?

11:35  21          MS. GITIN:  It's just a different portion of the

       22   site, so it's not part of this investigation.  It is -- it

       23   is being handled elsewhere at a different portion of the

       24   site.

11:35  25          THE COURT:  But is it being handled?

11:35   1        MR. RICHARDSON:  It has been handled, Your Honor.

2   So there was a consent decree in this case for that area,

3   and EPA actually did remediate that area already, to my

4   knowledge.

11:36   5        THE COURT:  Okay.  So EPA's already remediated.

6   Excellent.

11:36   7        MS. GITIN:  Yes.  There's been a removal action to

8   protect the public at that area.

11:36   9        THE COURT:  Okay.

11:36  10        So DAAC asks, in the next comment, that EPA not

11   limit the feasibility study.  And the plaintiffs have agreed

12   that the FS should not be limited, that the FS will look at

13   appropriate cleanup options.  And the section of EPA's RIFS

14   guidance that is cited in the Statement of Work merely says

15   that:

11:36  16         "For high volume, low concentration

17           waste, if treatment technologies are not

18           practicable, then evaluation of

19           alternatives in an FS may focus

20           primarily on various containment

21           options; in other words, if a particular

22           technology is truly not feasible, the FS

23           may focus primarily elsewhere."

11:36  24   I don't understand that.

11:37  25        MS. GITIN:  So I think that the commenters may've

```
 1    been concerned that a statement was something broader than

 2    it was.

 3            All we said in the area that they cite is that

 4    if -- we cited to guidance that says that the feasibility

 5    study may focus on technologies that are feasible.  It's a

 6    bit of a tautology.  If something has been determined not to

 7    be feasible, then the feasibility study can focus primarily

 8    on technologies that have been determined to be feasible.

 9            THE COURT:  Okay.

10            COURT'S INQUIRY RE RISK ASSESSMENT

11            THE COURT:  Then the next comment states that the

12    RIFS should reassess previously completed ecological risk

13    assessments from the 1992 to 2008 time period.

14            The response is that plaintiffs' agree that the

15    RIFS should review and incorporate previously completed

16    health and ecological risk assessments for the Southern

17    Pathway.

18            Is there any other inquiry I should be making?  I

19    think that that satisfies the comment.

20            The next comment is that the -- Del Amo also

21    raises concern about the public's opportunity to understand

22    the --

23            (Court reporter requests clarification for the

24        record.)

25            THE COURT:  Del Amo also raises concerns about the
```

11:37 — 3
11:37 — 9
11:37 — 10
11:37 — 11
11:37 — 14
11:38 — 18
11:38 — 20
11:38 — 23
11:38 — 25

2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

96

1   public's opportunity to understand the past investigations

2   at this "OI," and about residents' ability to understand the

3   context of whether to consent to sampling in their yards.

11:38   4          As long as you had these ongoing discretions and

5   transparency, then hopefully -- this is extraordinarily

6   complicated area -- those who are representing Del Amo, then

7   are conveying this information to their constituents.

11:39   8          *(Live switch to CourtSmart system at 11:39 a.m.)*

11:39   9          *(Further proceedings recorded with to CourtSmart*

10          *system, to be transcribed separately in Volume II.)*

11:39   11                      -oOo-

11:39   12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:90-cv-03122-DOC-GJS  Document 3084  Filed 11/08/21  Page 97 of 97  Page ID #:15707
2:90-CV-03122-DOC - 9/28/2021 - Item Number 2

97

| | | |
|---|---|---|
| 11:39 | 1 | -oOo- |
| 11:39 | 2 | |
| 11:39 | 3 | CERTIFICATE |
| 11:39 | 4 | |
| 11:39 | 5 | I hereby certify that pursuant to Section 753, |
| | 6 | Title 28, United States Code, the foregoing is a true and |
| | 7 | correct transcript of the stenographically reported |
| | 8 | proceedings held telephone in the above-entitled matter and |
| | 9 | that the transcript page format is in conformance with the |
| | 10 | regulations of the Judicial Conference of the United States. |
| 11:39 | 11 | |
| 11:39 | 12 | Date:  October 26, 2021 |
| 11:39 | 13 | |
| 11:39 | 14 | |
| 11:39 | | /s/ Debbie Gale |
| 11:39 | 15 | _____ |
| 11:39 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| 11:39 | | CSR NO. 9472, RPR, CCRR |
| 11:39 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |